## Burns et al. *v.* Elliott-Lewis Electrical Company, Inc., Appellant.

Argued October 12, 1934.

244

Before TREXLER, P. J., KELLER, CUNNINGHAM, BALD-
RIGE, STADTFELD, PARKER and JAMES, JJ.

*George H. Detweiler,* for appellant.

*Grover C. Ladner,* of *Ladner & Ladner,* for appellee.

OPINION BY CUNNINGHAM, J., May 28, 1935:

The right of recovery in this action for personal in-
juries to the infant plaintiff depends upon the answer
to the familiar question whether the concededly negli-
gent mechanic was the employee of the defendant com-
pany or of an independent contractor. That question
was submitted to the jury, and its findings were for
the respective plaintiffs. We are asked only to review
the sufficiency of the evidence to sustain the verdicts.

On June 8, 1932, the infant plaintiff, about three
years of age, was taken by her grandmother to visit a
Mrs. Farley, the owner of a Copeland refrigerator.
They were present in the kitchen of Mrs. Farley's home
while a mechanic attempted to repair the machine.
During the course of the job, he allowed a portion of
the refrigerating gas to escape. This was ignited by a

lighted range in the room, and caused the injuries complained of.

The mechanic, according to plaintiff's evidence, was summoned in the following manner: When the refrigerator was found to need repairs on June 4th, Mrs. Farley sent one of her boarders to the store where the machine had been purchased. The dealer stated that he was not equipped to make repairs, and referred the messenger to defendant's place of business on Race Street, Philadelphia. Defendant at that time was the exclusive distributor for the Copeland refrigerator in the city. The boarder stated that on June 6th he duly went to the Race Street office, explained his errand, and was referred in turn by an individual present in the office to "their branch" at 2004 Ridge Avenue, with the explanation that the branch had moved there some ten days previously. He then proceeded to the latter address, explained his mission, and asked if a man could be sent to make the repairs. A mechanic was sent to the Farley residence that same day, worked on the refrigerator (although without much success) and collected $7 for the service. In acknowledgment of the payment, he gave a receipt. It had at the top in large letters, the words: "Elliott-Lewis Electrical Co., Inc., 1017-19-21 Race Street, Philadelphia," and at the bottom, the printed signature: "Elliott-Lewis Elec. Co., Inc., per . . . . . . " As the refrigerator still did not function satisfactorily, the boarder was again, on June 8th, dispatched to the Ridge Avenue address for the repairman, and the injuries occurred in the course of his work on that day.

The defense was that the office at 2004 Ridge Avenue was in fact the place of business of one Robert A. Fowden, operating under the name of the National Refrigeration and Radio Service Company; that defendant had as of June 1, 1932, turned over the servicing of the refrigerators to Fowden, under an oral contract

whereby the latter was to receive $7.50 for one year's service for each machine sold by defendant; and that defendant retained no control over the servicing, but that Fowden was an independent contractor hiring and paying his own men and running his own office. Prior to this date, defendant concededly had run its own service department. Its secretary, Dougherty, gave this explanation for the change: "Q. On June 1, 1932, tell us what happened between Fowden and your company about establishing Fowden in business? A. As a matter of fact, we had been talking for some time, we had a service department in which we handled all service claims on Copeland refrigeration. It had been very unsatisfactory, our expenses had been very high, and our vice-president in charge of sales suggested that there must be a better way out of all this bedlam, this having a service department on our hands and a tremendous service expense. ...... Q. Just tell us what happened. A. We got hold of Bob Fowden and called him into the office. At that time I think he was on Jefferson Street, in a radio service. ...... Q. As a result of the conversation between your officials and Fowden, what was done? A. We agreed that on the first of June, 1932, Fowden would take over our service, our Copeland service, and we also agreed that in the form of compensation, we would pay him exactly what we had set up on our books for the service; in other words, when we sold a Copeland Refrigerator, we set up $7.50 for service for one year, and we agreed with Fowden that that was the amount that would be set aside to him and that he would be paid twice a month on that basis." At a later point in his testimony, he said: "A. ...... We were the distributors for Copeland refrigerators both domestic and commercial, we took over the commercial refrigeration at a time when it was very low, because the previous distributor had neglected the sales of it and had made very peculiar sales. We

operated a service department ourselves for some time, and we lost money on it, the thing was a nuisance to us, the service department was a bedlam, men coming in and out, getting parts, and all that sort of stuff, so we decided we would put the service department on the outside, and not interfere with the operation of our business on Race Street, which is strictly wholesale. We were absolutely of the opinion that anyone operating a service department would make a loss, but that didn't make a bit of difference to us, whether we lost it to ourselves or to Fowden, we had to perform the service, and we wanted to do it, and that is the reason we determined to do it with Fowden, not as a financial proposition with him, because he didn't have anything."

The actual method of operation was developed in detail in Dougherty's examination. Fowden's employees were men who had worked in defendant's own service department prior to June 1st. Fowden was concededly without capital and was financed throughout by defendant. Starting in June, defendant constantly made shipments of parts and supplies to him on credit, and also made nine loans to him to meet his payroll and expenses of operation. By December, 1932, the merchandise credit amounted roughly to $2,100, and the loans to $3,400. During the same period, Fowden received total payments for servicing of $5,596.47, of which $5,008.95 was cash and $587.52 a book credit. In September, 1932, Fowden and the men under him moved to another of defendant's buildings at 2518 North Broad Street and there occupied a room, for which no rent was charged. In December, the arrangement was terminated because, as Dougherty expressed it, "We consolidated the service departments of the oil burner and the refrigerators." Fowden and the mechanics were thereafter paid directly by defendant. At that time Fowden had made no payment whatever on his book indebtedness, and therefore apparently owed de-

fendant approximately $5,500 for the loans and merchandise noted above. No attempt was made to collect this indebtedness until April, 1933, at which time it was testified that defendant began to deduct $20 a month from Fowden's pay. By November, 1933, the time of trial, the books indicated that Fowden's indebtedness, for some reason, was then only $1,981.72. No notes were ever taken to secure this indebtedness.

Some of Fowden's testimony is also illuminating as to the real status of the parties. He stated that he had no order forms of his own, but that the forms, as well as the receipts, he used were furnished him by defendant. When asked, "You were just the service department, were you not?" he answered in the affirmative. He also stated that defendant itself referred to his organization as its "Service Department," and that he performed no refrigerator servicing for any other concern. One of his answers reads: "We were responsible to the Elliott-Lewis Company for the correct conduct of the service department, naturally we would be. And we would report to them from time to time; as a matter of fact, Mr. Dougherty of their company would visit my office and go over matters in detail with us, regarding our operation."

It seems to us that the mere recitation of these facts indicates that the case was necessarily for the jury. It is true that the mechanic, for a certain period, was paid directly by Fowden; but it is also a fact that he and his fellow-employees moved almost automatically from defendant's payroll to Fowden's and then back again. It is true that defendant did not directly pay the rent for the Ridge Avenue office; but Fowden paid defendant no rent for the room at 2518 North Broad Street. The bookkeeping system of "sales," "loans" and "credits" would seem to indicate offhand that Fowden was an independent contractor; but the informality of the contract, the failure to take any security for, or evidence

of, the indebtedness, the extent of the credit, and the unexplained cancellation of the greater part of the paper debt, are all inconsistent with the normal dealings between contractor and contractee. These circumstances seem even more striking when it is recalled that defendant was obligated, under its contract with Copeland, to render free service on refrigerators for a period of one year after sale, and hence would not be likely to relinquish all control over the performance of this obligation to an irresponsible party.

The reconciliation of the factors thus· entering into the problem is not an easy task. The relationship was undoubtedly ambiguous and ill-defined; but to concede the ambiguity is to admit that the line is not to be drawn as a matter of law by a court. It is our duty to consider the evidence upon both sides, but it is not our function to determine which way the scales tip. It seems to us that the defendant has removed certain facts from their setting and then placed undue emphasis upon them. It argues that the mechanic's action in giving the receipt upon its printed form does not establish agency, because that relationship cannot be established by proof of the declaration of an alleged agent; but it ignores the fact that it supplied the blank form. It contends that a casual reference by an unidentified individual to defendant's "branch" is not conclusive. Here again, however, this circumstance cannot be singled out as controlling, because it is not the only evidence upon the vital issue in the case.

It is contended there is no contradiction of the statement that Fowden alone had full control over his employees, but the matter of such control is only persuasive; it is not conclusive until it has been determined to what extent defendant, in turn, controlled Fowden. It may well be that defendant honestly wished to be free of the immediate supervision of the service department and to put full responsibility upon Fowden. The

question, however, is not whether it *did,* but whether it *could,* control. If Fowden was actually an independent contractor, dealing with defendant at arm's length, then there should be no recovery against it. Defendant is correct in contending that the reasons for making such a contract are immaterial.

If, on the other hand, Fowden was in fact hired to manage the service department, no matter under what complicated method of compensation or with what freedom of discretion in certain directions, then the existing arrangements for hiring, paying and discharging mechanics were subordinate to the primary intent. There was competent evidence from which a jury could reasonably find that the latter was the actual situation, and this is all we are called upon to decide. Defendant asks us to follow our case of Tyler et al. v. MacFadden Newspapers Corp., 107 Pa. Superior Ct. 166, 163 A. 79. The contractual obligations of the parties there involved, however, pointed to but one conclusion, and that inference is not the only one apparent in the case at bar. We are not convinced that the learned trial judge erred in refusing defendant's point for binding instructions. It follows that its motion for judgment in its favor upon the whole record was properly denied by the court below.

The judgments are severally affirmed.