Morris et ux. *v.* Ward et al., Appellants.

Argued October 16, 1941.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, RHODES and HIRT, JJ.

*John H. Sorg,* for appellants.

*H. E. McCamey,* with him *H. A. Robinson,* of *Dickie, Robinson & McCamey,* for appellees.

OPINION BY STADTFELD, J., February 28, 1942:

This is an action in trespass, tried in the County Court of Allegheny County before SOFFEL, J. and a jury. Verdicts were rendered in favor of the plaintiffs-appellees, John H. Morris and Ethel M. Morris, his wife.

The action was originally instituted against both the appellants and George P. Bassett, the owner and operator of the automobile which collided with that of the appellees. George P. Bassett having died shortly following the accident, the suit was continued as to the appellants alone. At the time of the accident, which took place on July 1, 1938, the appellees were driving their automobile in an easterly direction on Route 30. George P. Bassett, whose automobile collided with that of the appellees, was driving in a westerly direction on said route.

The question for consideration is whether the court erred in failing to affirm defendants' written point for binding instructions. The decision of this question depends on three constituent questions, all of which must be answered in the affirmative in order to support the judgment. They are (1) Was Bassett the agent of the defendants? (2) In the use of his car on the day of the accident was he engaged in furtherance of the defendants' business? (3) Was the use of his automobile by Bassett in the circumstances of this case, instead of his travel by train or other common carrier, so reasonably necessary to further the interests of his employers and thus constitute potential control of the automobile by the defendants at the time and place of the accident?

(1) Appellees' statement of claim having alleged that the automobile operated by George P. Bassett was owned by the appellants, and was being operated by him as agent of the appellants, an affidavit of defense was filed denying these allegations. The affidavit of defense filed by the defendants denying

agency on the part of Bassett, placed upon the plaintiffs the burden of establishing affirmatively that at the time the accident occurred Bassett was the agent or employee of the defendants, acting within the scope of his employment and in the furtherance of defendants' interest or business. We quote from the opinion of the court below which correctly states the facts as they appear of record: "In attempting to meet the burden of proof resting upon them, the plaintiffs called as for cross-examination Charles S. B. Ward, general manager of the defendant company. He testified that prior to July 15, 1937, Mr. Bassett had no written contract with the defendants but that subsequently a written agreement was entered into; that Mr. Bassett was not allowed an expense account nor was he reimbursed for the use of his car, that he was paid only on a straight commission basis. He further stated that the Follansbee Brothers account had been secured by Mr. Bassett and was handled exclusively by him. He further testified that Mr. Bassett had the right to use the company's stationery, dictate to the company's stenographers and sign the company's name, as per Bassett, to any letters he might write. Mr. Ward stated that he had no knowledge as to the whereabouts of Mr. Bassett on the date of the accident, nor did he know where Bassett might have been going.

"The plaintiffs then called Mr. Fried, bookkeeper of the defendant company. In connection with the examination of this witness plaintiffs introduced into evidence letters written to the Follansbee Brothers Company 'The Weiman & Ward Company, by George P. Bassett'. 'The Weiman & Ward Company' was typewritten and Mr. Bassett's name was signed underneath the typing.

"The plaintiffs then called C. L. Shultz, purchasing agent for the Follansbee Brothers Company. Mr. Shultz testified that the Follansbee Brothers Company

bought pig iron from the Weiman & Ward Company and that matters in respect to the pig iron contract were discussed always with Mr. Bassett. Mr. Shultz then stated that on July 1, 1938, the date of the accident—this being a Friday—he had called Weiman & Ward Company asking to speak to Mr. Bassett. As Bassett was not there, Shultz advised the Weiman & Ward Company that shipments of pig iron to the Toronto plant were to be deferred, the reason being that there was a pickup in the stock of pig iron and Follansbee Brothers expected to bank its furnaces over July 4th. This telephone conversation was confirmed by letter which reads as follows: 'July 1, 1938 File 2751 PURCHASING AGENT Weiman and Ward Company, Oliver Building, Pittsburgh, Pennsylvania, Attention: Mr. G. P. Bassett Gentlemen: In accordance with telephonic instructions with your office today, you were advised to defer further shipments of Pig Iron to our Toronto, Ohio, plant. We find it necessary to make these arrangements due to the slight pick up in our stock of Pig Iron, also the banking of our furnace over July 4th. However, we expect to issue further instructions sometime during the forepart of the week of July 11th. Trusting these arrangements meet with your approval, beg to remain, Very truly yours, John Follansbee, Geo. T. Ladd & Isaac M. Scott, Trustees for Follansbee Brothers Company, CLS:MEM.' Mr. Shultz testified further that later in the day Mr. Bassett had called him by phone and had stated that he (Bassett) would call on him at the Follansbee Brothers plant or office in Follansbee, West Virginia, about two that afternoon. Nowhere in the record does it appear affirmatively what the purpose of Mr. Bassett's call might have been. Mr. Shultz testified that the offices of the Follansbee Brothers Company were located at Follansbee, West Virginia, and the mill was twelve miles away, at

Toronto, Ohio. In going from the offices to the mill either a street car or bus might be used.

"Evidence adduced by the plaintiffs established the fact that the only morning trains available between Pittsburgh and Follansbee, West Virginia, were at 5:30 A.M. and 7:10 A.M., and that there was no train after that until 4:15 P.M. However, bus service was available throughout the day. The highway that Mr. Bassett was traveling was the most direct route between Pittsburgh and Follansbee.

"This is the complete testimony offered by the plaintiffs in an effort to establish that Mr. Bassett, who was driving his own automobile on the particular highway in question, was at the time of the accident (about 1:00 P.M. Standard Time) acting as agent or employee of the defendant company in the course of his employment and was engaged in the furtherance of the interests of defendants. Was this testimony sufficient to meet the burden imposed upon the plaintiffs? ......"

There is no evidence that Bassett worked for anybody other than Weiman & Ward nor that he had any other business in Follansbee other than the Weiman & Ward account. Bassett was under the direct control of the general manager, Charles S. B. Ward and as testified by Mr. Ward, he executed the contracts, made the changes in these contracts, used the offices for correspondence and received correspondence at their address, to Weiman & Ward, attention Bassett, and generally conducted the entire control of the Follansbee account from the offices of Weiman & Ward and under the supervision of Charles S. B. Ward, the manager. Bassett did not carry out any contract free of all control or supervision. He was actually executing contracts, writing letters, and handling an account for Weiman & Ward under the express and definite control of Charles Ward, the general manager of the defendant.

Under plaintiffs' testimony this question of the rela-

tionship between the parties became one for the jury. See, *Eckert v. Merchant's Shipbuilding Corp.*, 280 Pa. 340, 124 A. 477; *Burns v. Elliot-Lewis Electrical Co.*, 118 Pa. Superior Ct. 243, 179 A. 47.

(2) On the day in question, July 1, 1938, Bassett was employed under a contract by which he received one-third of all the gross profits from the sale of pig iron. Weiman & Ward Company was shipping to Follansbee Brothers Company 400 tons of pig iron per week at the rate of $22.03 per gross ton, or a total of approximately $8800 per week, which, of course, was an important item of business. On July 1, 1938, information was received by Mr. Bassett that Follansbee Brothers Company was not desirous of receiving shipments of pig iron for some time due not only to the increase in stock of Follansbee Brothers Company but also because of the banking of the furnace over July 4th. It was necessary for the defendant to know when shipments would be resumed since the operation of their plant had to be governed accordingly. It was undoubtedly therefore, in order to ascertain the amount of stock on hand at the plant and to discuss with Follansbee the desire of resuming shipments, that Bassett found it necessary to go to Follansbee on the date of this accident. Upon notice that the shipments had been stopped he immediately called Shultz at Follansbee and advised him that he would be in Follansbee at 2:00 o'clock that afternoon.

Bassett immediately called Follansbee upon notification that shipments were to be stopped; he made an appointment to be there at 2:00 o'clock that afternoon; and he was on a direct route to Follansbee at the time of the accident. Every inference was that he was going to Follansbee to determine the details with respect to a contract over which he had complete control.

(3) In connection with the two preceding questions we should consider whether the evidence was sufficient to submit to the jury to determine if it was

reasonably necessary for Mr. Bassett to use the automobile in the furtherance of defendant's business, under the circumstances. The testimony of Ward, the general manager for appellants, is important in determining of this question. We quote therefrom as follows: "A. You have to know what is sold to ship it. Q. And you have to know about what sales are expected in order to know how to operate your mill, don't you? A. Certainly. Q. So that it would be very important to know whether a customer that had discontinued taking four or five hundred tons a week was going to resume taking that tonnage within a week or within a month, wouldn't it? A. Yes, sure, sure."

Bassett had directed the operation of this particular account and a jury might reasonably infer that he had authority to take whatever steps were reasonably necessary to keep the account in order and to carry on the necessary milling operations. The testimony reveals that the information to be received at Follansbee was vitally important in the carrying out of the contract and in the milling operation, and that the contractual relations between Follansbee and defendants could not be well understood without such an interview. A jury might fairly conclude that such information could not have been procured at any nearer place than Follansbee and Toronto, Ohio, and that the use of the automobile was the most reasonable way of getting there; and that his trip was prudent exercise of that duty would be an entirely reasonable inference from the testimony. There was sufficient legally competent evidence adduced to prove, as required by *Wesolowski et al. v. John Hancock Mutual Life Insurance Co.,* 308 Pa. 117, 122, 162 A. 166, "that the use of the automobile by the agent and servant was of such vital importance in furthering the business of the master that the latter's actual or potential control of it was a legitimate inference." See also

*Gittelman v. Hoover Company,* .337 Pa. 242, 10 A. 2d 411.

After a most careful examination of the entire record and consideration of the very able briefs, we are of the opinion that it would have been error to have withdrawn the consideration of this case from the jury.

The assignments of error are overruled and judgment affirmed.