Siidekum, Admr., Appellant, *v.* Animal Rescue League of Pittsburgh (et al., Appellant).

Argued September 26, 1945. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*H. Stewart Dunn*, Assistant City Solicitor, with him *Anne X. Alpern*, City Solicitor, for City of Pittsburgh.

*John E. Evans, Jr.*, with him *Robert A. Rundle, George I. Minch, Evans, Evans & Spinelli*, and *Wright & Rundle*, for plaintiff.

*Harold E. McCamey*, with him *Dickie, Robinson & McCamey*, for Animal Rescue League.

OPINION BY MR. JUSTICE HORACE STERN, January 7, 1946:

On November 1, 1943, Naomi Irene Siidekum was killed when an automobile in which she was a passenger and which was being driven by Harvey E. Domhoff came into collision with a truck belonging to the Animal Rescue League of Pittsburgh and operated by James V. Jackson, a policeman of the City of Pittsburgh. Suit was brought against the City, the League and Jackson

by Fred H. Siidekum, as administrator c. t. a., on behalf of decedent's estate and of those entitled to recover for her wrongful death; the League brought in Domhoff as additional defendant. The trial resulted in a verdict against the three defendants in the sum of $955 for the estate and $25,000, subsequently reduced by the court to $12,000, for the husband, he being the person entitled to the recovery under the "death" acts; a verdict was also returned in favor of the additional defendant. The court upheld the verdicts against the City and against Jackson but granted judgment n. o. v. in favor of the Animal Rescue League.

That the accident was due solely to the negligence of Jackson is now admitted by all parties; the question is whether, in operating the truck at the time of the accident, he was acting as an employe of the City, of the League, or of both. A further controversy arises from the fact that the League successfully claimed immunity from liability on the ground of its being a charitable organization. There is also a complaint by defendants as to the alleged excessiveness of the verdict recovered on behalf of decedent's husband.

By the Dog Law of 1921, P. L. 522, §19 (amended by the Act of 1935, P. L. 219) it was made the duty of every municipal police officer to seize and detain any dog found running at large and unaccompanied by its owner or keeper. The seizure of stray dogs, as a function of the government of the City of Pittsburgh, is under the charge of the Director of the Department of Public Safety.

The Animal Rescue League is an organization formed for the purpose of sheltering neglected dogs, cats and horses, restoring them to their owners or otherwise providing for them, and preventing them from being cruelly treated. In order to carry out its operations it owns appropriate equipment, including trucks with specially built bodies containing individual cages; it also conducts

a farm on which it maintains boarding kennels, and it employs the services of veterinaries to administer to diseased and injured animals.

Because of the common objective of the City and the League in the seizure and proper disposition of stray dogs, and because of the facilities possessed by the League for that purpose, the City has, over a long course of years, entered annually into contracts with the League whereby, for the sum (in the 1943 contract) of $1,000 per month, the League assumed the duty, "under the supervision of the Director of the Department of Public Safety, to have the City streets properly patrolled; to arrest dogs found running at large in accordance with the Dog Law of the State of Pennsylvania, and to maintain necessary property and equipment as hereinafter specified." The league agreed to maintain a detention station with kennels, to operate a fleet of four or more trucks, and to "furnish with each a driver, who shall be an official dog catcher and canvasser". It was provided that "The Police Officers assigned to the Contractor shall assist and coöperate with him [sic] in all phases of the work; shall assist the drivers and canvassers in the work of catching, collecting and impounding dogs, and shall drive the trucks when the drivers are engaged in other duties."

Under these contracts it was customary for the City to assign four police officers for full-time service with the League. Jackson was among those so assigned; there was testimony to the effect that the League opposed his selection on the ground that he was addicted to drink. Due to the scarcity of labor in 1943 the League was without sufficient employes of its own to operate its trucks and Jackson drove more or less constantly during that year. On the day of the accident there was only one qualified driver on hand, so that three of the four policemen assigned by the City were engaged in operating the trucks. An emergency call came in to pick up a stray

dog that had been injured; Jackson drove the truck that went out on this errand, being accompanied by a young lad who was an employe of the League but not a licensed driver; it was on the way back, with the dog in the truck, that the accident happened.

Was Jackson, in driving, acting as the employe of the City of Pittsburgh,[1] of the Animal Rescue League, or of both? The learned trial judge left it to the jury to determine this question, and they found that both were liable. As to what constitutes the relationship of employer and employe, and as to the status of a "loaned" employe, the law leaves little room for doubt. By a continuous stream of authorities [2] it has been declared that where one person lends his servant to another for a special employment the test is whether, in the particular

---

[1] By §619 of the Vehicle Code of 1929, P. L. 905, amended by the Act of June 29, 1937, P. L. 2329, the City would be liable for damages caused by the negligence of any of its employes while operating a motor vehicle upon a highway in the course of his employment.

[2] *Jimmo v. Frick*, 255 Pa. 353, 356, 357, 99 A. 1005, 1006; *Puhlman v. Excelsior Express and Standard Cab Co.*, 259 Pa. 393, 397, 103 A. 218, 219; *Tarr v. Hecla Coal & Coke Co.*, 265 Pa. 519, 522, 109 A. 224, 225; *Eckert v. Merchants Shipbuilding Corporation*, 280 Pa. 340, 348-350, 124 A. 477, 480, 481; *Sgattone v. Mulholland & Gotwals, Inc.*, 290 Pa. 341, 346, 138 A. 855, 857; *Robson v. Martin*, 291 Pa. 426, 430-432, 140 A. 339, 341, 342; *Bojarski v. M. F. Howlett, Inc.*, 291 Pa. 485, 489-491, 140 A. 544, 545, 546; *Persing v. Citizens Traction Co.*, 294 Pa. 230, 235, 236, 144 A. 97, 99; *Milwaukee Locomotive Manufacturing Co. v. Point Marion Coal Co.*, 294 Pa. 238, 245, 144 A. 100, 102; *Lang v. Hanlon*, 302 Pa. 173, 177, 153 A. 143, 145; 305 Pa. 378, 382-384, 157 A. 788, 789, 790; *Rosen v. Diesinger*, 306 Pa. 13, 16, 17, 158 A. 561, 562; *Gordon v. S. M. Byers Motor Car Co.*, 309 Pa. 453, 458, 459, 164 A. 334, 335, 336; *Rau v. Wilkes-Barre & Eastern R.R. Co.*, 311 Pa. 510, 516, 517, 167 A. 230, 233; *Venezia v. Philadelphia Electric Co.*, 317 Pa. 557, 559, 177 A. 25, 26; *Pennsylvania Co., etc., v. Philadelphia Electric Co.*, 331 Pa. 125, 129, 130, 200 A. 18, 21; *Joseph v. United Workers Association*, 343 Pa. 636, 638, 639, 23 A. 2d 470, 472; *McGrath v. Edward G. Budd Manufacturing Co.*, 348 Pa. 619, 622, 623, 36 A. 2d 303, 304, 305; *Dunmire v. Fitzgerald*, 349 Pa. 511, 516, 37 A. 2d 596, 599; *Hoffman v. Montgomery County*, 146 Pa. Superior Ct. 399, 402, 22 A. 2d 762, 763.

service which he is engaged to perform, he continues liable to the direction and control of his general master or becomes subject to that of the party to whom he is lent or hired; the criterion is not whether the borrowing employer *in fact* exercises control but whether he has the *right* to exercise it. It is also well recognized that under some circumstances both the lender and the borrower may have control over the servant so as to render each of them liable for his conduct, for he may have been transferred to carry on work which is of mutual interest to them and to effect their common purpose, so that his service to the one does not involve abandonment of his service to the other.[3] It is further established that, when different inferences can reasonably be drawn from the testimony as to whether the lender or the borrower is the controlling master at the time of the accident, or whether both of them have the right of control, the question is one for the jury.[4]

In the present case the jury found, from what we regard as amply sufficient evidence, that when Jackson was driving the truck at the time of the accident he was acting on behalf of both the City of Pittsburgh and the Animal Rescue League, and that therefore, as far as this phase of the litigation is concerned, both these defendants were liable for the death caused by his negligence. The seizure and detention of stray dogs was the objective of both the City and the League, the one in pursuance of its statutory duty, the other of its chartered purpose.

---

[3] Rest. Agency, §226; *Gordon v. S. M. Byers Motor Car Co.*, 309 Pa. 453, 459, 460, 164 A. 334, 336; *Koontz v. Messer*, 320 Pa. 487, 492, 181 A. 792, 794; *Grasberger v. Liebert & Obert, Inc.*, 335 Pa. 491, 493, 6 A. 2d 925.

[4] *Atherholt v. William Stoddart Co.*, 286 Pa. 278, 280, 133 A. 504, 505; *Lang v. Hanlon*, 302 Pa. 173, 178, 153 A. 143, 145; *Dougherty v. Proctor & Schwartz, Inc.*, 317 Pa. 363, 176 A. 439; *Grasberger v. Liebert & Obert, Inc.*, 335 Pa. 491, 493, 6 A. 2d 925; *Joseph v. United Workers Association*, 343 Pa. 636, 639, 23 A. 2d 470, 472, 473; *Dunmire v. Fitzgerald*, 349 Pa. 511, 516, 37 A. 2d 596, 599.

It was essentially a common enterprise; by the terms of the contract the police officers assigned by the City were to assist and coöperate with the League "in all phases of the work"; they were to drive the trucks when the drivers were engaged in other duties. The City did not "lend" Jackson for the performance of work which was of interest only to the League as a "borrowing" employer and in which the City itself had no concern. Jackson was not chosen, selected, or requested by the League; on the contrary, it had opposed his assignment. As a police officer, whether engaged in driving the truck or otherwise, he remained on the payroll, in the service, and under the control, of the City as his employer; driving the truck was merely incidental and necessary to the work of capturing stray dogs which was his statutory duty and the ultimate object for which he was assigned to the work. If the City did not in fact attempt to exercise control over his actions it had the power to do so, and it is the *power* of control which is the determining factor. On the other hand, in driving the truck he was engaged also in the service of the League; he was operating one of its trucks on its own business and was under the immediate direction of its superintendent. The verdict of the jury, therefore, was consistent with, and sustained by, the circumstances of the case, and even if the question were to be regarded as one of law depending solely upon the construction of the contract between the parties the same conclusion would necessarily follow.

This brings us to the inquiry whether the court was right in exempting the Animal Rescue League from liability because of its being a charitable organization. Whether a purely public charity should be held legally responsible for the negligence of its servants is a question that has given rise to an astounding diversity of opinion. Justice RUTLEDGE, then of the United States Court of Appeals for the District of Columbia, now a Justice of the Supreme Court of the United States, said in *President and Directors of Georgetown College v. Hughes*, 130

F. 2d 810, 812: "Paradoxes of principle, fictional assumptions of fact and consequence, and confused results characterize judicial disposition of these claims. From full immunity, through varied but inconsistent qualifications to general responsibility, is the gamut of decision. The cases are almost riotous with dissent. Reasons are even more varied than results." However, as far as Pennsylvania is concerned, the law on this subject is perfectly clear, for it was definitely held in *Fire Insurance Patrol v. Boyd,* 120 Pa. 624, 15 A. 553, that the rule of respondeat superior does not apply in the case of injuries occasioned by the negligence of the agents or servants of a charitable organization; indeed it was there said (pp. 647, 648, A. p. 557) : "This doctrine [that a public charity is bound to apply its funds in furtherance of the charity and not otherwise] is hoary with antiquity and prevails alike in this country and in England where it originated as early as the reign of Edward V, and it was announced in the Year Book of that period." In *Gable v. Sisters of St. Francis,* 227 Pa. 254, 75 A. 1087, a similar ruling was made in the case of a suit against a hospital by a patient who had been injured by the negligence of a nurse, the Court saying (p. 258, A. p. 1088) : "It is a doctrine too well established to be shaken, and as unequivocally declared in our own state as in any other, that a public charity cannot be made liable for the tort of its servants." It was there held that the fact that the hospital received pay from some of its patients did not detract from its character as a purely charitable institution, and that it was immaterial that the plaintiff herself had been treated as a pay patient. Neither has any distinction been made in our courts, as it has been in some other jurisdictions, between cases where the injured person was a beneficiary or an employe of the charity and those where, as in the *Boyd* case, he was a total stranger to its activities.

Plaintiff apparently admits, as he must, that the Animal Rescue League, as a non-profit organization en-

gaged in the humane undertaking of caring for animals, all of its capital funds and income being used for that purpose, is a purely public charity. Its status as such has been established by judicial decision *(Ammon's Estate,* 72 P. L. J. 872) and by rulings of governmental agencies. Plaintiff contends, however, that, because it entered into a contract under which it is being compensated by the City in an amount constituting more than one half of its total income, and because the accident occurred in the course of operations under that contract, it was, pro hac vice, engaged in a commercial and not a charitable enterprise. The fact that a charitable organization charges for some of the work performed by it for persons able to pay does not militate against its status as a charity; many charities derive income from compensation for their services. Of course, if, as in *Winnemore v. Philadelphia,* 18 Pa. Superior Ct. 625, a charitable institution conducts a business enterprise not directly related to the purpose for which the charity was organized, any negligence on the part of its servants or agents in the operation of that enterprise imposes liability upon the charity. Here, however, the services rendered by the League were the same as those for which it was chartered, and the compensation it received from the City was in no different legal category than the contributions and donations it obtained either from persons directly benefited by its activities or from strangers. Nor is its immunity from liability destroyed or impaired because, as was intimated in the testimony, it carried liability insurance: *Kesman v. Fallowfield School District,* 345 Pa. 457, 29 A. 2d 17.

Complaint is made by the City of Pittsburgh in regard to the amount of the verdicts, but we cannot say that, as reduced by the court, they are excessive (see *Filer v. Filer,* 301 Pa. 461, 465, 466, 152 A. 567, 568), representing, as they do, a recovery both on behalf of decedent's estate and on behalf of those entitled to damages because of the wrongful death. The decedent was

30 years of age, in excellent health and, at the time of her death, was earning in outside employment at the rate of $1140 per year; she is described as having been a good wife and a good housekeeper, and she lived in harmonious relations with her husband who is a young engineer graduated from the Carnegie Institute of Technology. However, the manner in which the jury apportioned the total amount between plaintiff acting on behalf of decedent's estate and plaintiff acting on behalf of those entitled to recover damages for the wrongful death—$955 for the estate and $25,000, reduced to $12,-000, for the decedent's husband—was clearly erroneous and undoubtedly resulted from the curious fact that the court, without objection on the part of counsel, instructed the jury that the wife's earnings during the period she would have lived but for the accident constituted an item recoverable on behalf of her husband. It would seem scarcely necessary to say that since the Married Women's Property Acts the law does not regard married women as slave laborers even for their husbands. The administrator suing on behalf of decedent's estate was entitled to recover the economic value of her life as measured by the present worth of her likely earnings during the period of life expectancy: *Pezzulli v. D'Ambrosia*, 344 Pa. 643, 26 A. 2d 659. For the husband, on the other hand, recovery was limited to the loss of her services and society as a wife, less the "probable cost of her maintenance which he would have been compelled to pay, as well as other incidental items that he would probably have given her": *Gaydos v. Domabyl*, 301 Pa. 523, 533, 534, 152 A. 549, 553. Had these respective measures of recovery been properly observed it is obvious that the verdict on behalf of decedent's estate would have been substantially greater and that on behalf of the husband correspondingly less. However, we are informed that decedent had no creditors and we learn from an inspection of her will that any recovery obtained by her estate in the present action would pass to her

husband as residuary legatee. As she left no children, and was survived only by her mother and her husband, he is also the sole person entitled to the damages recoverable for her wrongful death *(Lehigh Iron Co. v. Rupp,* 100 Pa. 95; *Lewis v. Hunlock's Creek & Muhlenburg Turnpike Co.,* 203 Pa. 511, 53 A. 349). Therefore the apportionment of the total verdicts between the two interests represented by the plaintiff administrator becomes a matter of no practical moment, and for that reason does not, under the facts of the present case, require the granting of a new trial.

Judgments affirmed.

---

CONCURRING OPINION BY MR. JUSTICE PATTERSON:

I concur with the conclusion of the majority that, under the facts of this case, the Animal Rescue League should not be liable for damages for the sole reason that at the time of the accident it was engaged in carrying out its charitable purpose, to wit, care of injured animals. Distinction must be made between performance of an act by a charity in furtherance of the charitable purposes for which it was formed, and performance of an act which is the legal obligation of another but which the charity has contracted to perform. In the former, the rule of immunity applies; in the latter, it does not. It cannot properly be said that performance of the legal duties of another by a charity, pursuant to contract, renders such performance a charitable act. It is not enough that the act performed is "directly related to the purpose for which the charity was organized." The act performed or being performed must be a charitable one. Seizure of stray dogs cannot be said to be a charitable act; picking up and administering to an injured animal is.

I would base the decision of non-liability solely on the fact that at the time the accident occurred the League was engaged, not merely in performing its contractual duties, but, in the charitable act of taking an injured dog to its premises for medical treatment and care.