## Bond *v.* Pittsburgh, Appellant.

Argued March 27, 1951; reargued October 2, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*Thomas E. Barton,* Assistant City Solicitor, with him *Anne X. Alpern,* City Solicitor, for appellant.

*John Wirtzman,* for appellees.

*Arthur M. Grossman,* for Society of St. Vincent de Paul, additional defendant, appellee.

OPINION BY MR. JUSTICE HORACE STERN, November 13, 1951:

If a pedestrian is injured in a fall caused by a defect in the curbing of a city street and recovers damages in a suit against the municipality, can the latter maintain an action over for indemnity against a charitable organization which owns and occupies the abutting property? That is the principal question involved in the present appeals.

The wife-plaintiff, Frances Bond, fell one night in front of premises 1612 Webster Avenue, Pittsburgh, where the curbstone and sidewalk had worn away leaving a hole bordered at its outer edge by a broken steel band which had originally lined the curb; the hole was twelve inches long, ten to twelve inches wide and eight or nine inches deep. She and her husband, Vollie Bond, brought suit against the City of Pittsburgh for damages. The City brought in as additional defendant the Society of St. Vincent de Paul, the owner of the premises, which it occupied exclusively for charitable purposes. A verdict in the sum of $13,-500 for the wife and $2,500 for the husband was rendered for plaintiffs against the City and for the City over against the Society; the court reduced the wife's verdict to $12,000. The Society filed a motion for judgment n.o.v. which was granted. The City now appeals from the judgments entered against it in favor of the plaintiffs on the ground that the verdicts, even as thus reduced, were excessive, and it appeals also from the judgment entered in favor of the Society.

We consider first the question as to the amount of the verdicts. The wife-plaintiff was 29 years of age at the time of the accident. She worked out as a domestic by the day. She lost over $2,000 in earnings in the time between the accident and the trial and she will suffer also a substantial future loss because of inability to do the same hard work as before. She sustained a severe crippling injury consisting of a rupture of a ligament of the knee which resulted in excessive lateral motion of the joint and made it necessary for her leg to be placed in a splint for several months. Finally a major operation was required, consisting of the opening of the knee, the repair of the ligament, and the sewing of some of the muscles. Her leg was then kept in a cast for about ten weeks, after which a knee support was

prescribed for her which she has ever since been obliged to wear. She suffered considerable pain and there still remains some abnormal swelling of the joint; according to her doctor there is not likely to be any further improvement. As far as the husband is concerned, his actual expenses amounted to $1,034 and he will probably be required to expend additional sums in the future for the care of his wife's injury. On the whole, we are not convinced that the verdicts, the one of them as now reduced, are excessive.

This brings us to the question of the City's right to recover from the Society of St. Vincent de Paul.

Notwithstanding the violent criticisms that have been directed by academic legal writers against the doctrine of the immunity of charitable organizations from tort liability, and notwithstanding also the fact that there is considerable conflict in the judicial decisions on the subject among the several States, our own Commonwealth has, from the earliest times, stood firm in its adherence to the principle of immunity. For confirmation of that assertion it is only necessary to refer to such cases as *Fire Insurance Patrol v. Boyd,* 120 Pa. 624, 15 A. 553; *Gable v. Sisters of St. Francis,* 227 Pa. 254, 75 A. 1087; *Siidekum, Administrator, v. Animal Rescue League of Pittsburgh,* 353 Pa. 408, 45 A. 2d 59; *Betts v. Young Men's Christian Association of Erie,* 83 Pa. Superior Ct. 545; *Paterlini v. Memorial Hospital Ass'n of Monongahela City,* 247 Fed. 639 (3 C.C.). In the *Gable* case, supra, it was said (p. 258, A. p. 1088), "It is a doctrine too well established to be shaken, and as unequivocally declared in our own state as in any other, that a public charity cannot be made liable for the tort of its servants." Surely a doctrine so deeply embedded in the structure of our common law should not lightly be overturned in violation of the rule of stare decisis. Principles of the common

law are not established or developed arbitrarily; they congeal during the course of the years from the fluidity of recurrent judicial decisions which presumably reflect the sentiments and social values of the community. Measured by that standard there is no class of institutions more favored and encouraged by our people as a whole than those devoted to religious or charitable causes. Public-minded benefactors are not likely to have their generous impulses encouraged if advised that some janitor, watchman or other employe of a charitable organization who carelessly fails to note the displacement of a brick or stone in a pavement may thereby bring about the loss of all the property and funds which the donors had sought to devote to the common good. If and when there is to be any change in the doctrine of the immunity of charitable institutions from tort liability, it ought to be effected, not by the courts, but by the legislature, which is, of course, the ultimate tribunal to determine public policy. Incidentally, it will be remembered that this is not the only class of cases in which the victim of an accident may not recover damages from other than the individual who actually committed the tort; for instance, no such recovery is permitted where the accident results from the negligence of the agent or servant of a municipality while engaged in the performance of a governmental function.

It being assumed, therefore, as axiomatic that plaintiffs in this case could not have recovered damages had they brought action directly against the Society of St. Vincent de Paul, we are now called upon to decide whether, such recovery having been had from the municipality, the latter should be allowed to reimburse itself by recovery from the Society. It must be immediately obvious that if such a recovery were allowed the immunity of charitable organizations in cases of this

nature would thereby become merely theoretical, because every plaintiff would bring suit against the municipality and it in turn against the charity, so that the result which the law now frowns down upon would thus be accomplished merely through the device of instituting two actions instead of one. What is the real basis upon which the immunity principle rests? It is, as expressed in *Fire Insurance Patrol v. Boyd*, supra (p. 647, A. p. 557) that the funds specially contributed for a public charitable purpose should not be misapplied to objects not contemplated by the donors, for a public charity is but a trustee and is bound to apply its funds in furtherance of the charity and not otherwise. It was also stated in *Gable v. Sisters of St. Francis*, supra, (p. 258, A. p. 1088) that the doctrine rests fundamentally on the fact that liability, if allowed, would lead inevitably to a diversion of the trust funds from the purposes of the trust. That being so, it is evident that the evil which the doctrine aims to avoid would result in exactly the same manner if the trust assets of the charity were taken under a judgment obtained by the municipality as under a judgment obtained directly by the victim of the accident. Since, therefore, the reason for the enforcement of the rule exists equally in the one situation as in the other, the rule itself ought not be changed merely because of a difference in the process whereby recovery out of the assets of the charity is sought to be effected. To hold otherwise would be to ignore both the social philosophy and the practical considerations upon which the principle of immunity is founded. Resting as it does upon a public policy which aims to keep the funds of the institution intact in order to accomplish the larger ends for which they were contributed, that policy would be none the less defeated if its funds were to be siphoned off by an action of assumpsit brought by the municipality under a claim of

indemnity instead of by a tort action brought by the injured person. To recognize such a distinction as controlling, therefore, would be to magnify form at the expense of substance, legalism at the expense of realism.

The City makes much of the point that the Act of May 16, 1891, P. L. 75, Section 11, provides that the municipal authorities may require sidewalks and curbstones to be kept in repair, and if the property owner fails to do so the municipality may do the necessary work and assess the cost thereof upon the property and file a lien therefor or collect the same by action of assumpsit. There is an ordinance of the City of Pittsburgh which implements the authority thus given, and it is true that the liability, under such legislation, to keep the sidewalk in repair extends to, and may be enforced against, a charitable organization the same as any other property owner: see *Wilkinsburg Borough v. Home for Aged Women,* 131 Pa. 109, 18 A. 937; *Philadelphia v. Pennsylvania Hospital,* 143 Pa. 367, 22 A. 744. But this means that if the charity fails to make the necessary repairs and is obliged to pay for their cost when made by the municipality it will merely be paying for an improvement to its property or benefit actually received, so it is obvious that there is not involved thereby any improper diversion of its funds but only an expenditure similar to any other made by it for the purpose of keeping its property in good order and repair.

The City argues that it is unfair to make the taxpayers pay for the damages sustained by a person injured in an accident which was caused by the negligence of some servant or employe of the charity. There is nothing, however, unique in what thus amounts, perhaps, to a forced contribution by taxpayers to the maintenance of the charitable organization. For ex-

ample, the law exempts the real property of public charities from taxation, which means, of course, that all other property owners must pay greater taxes to make up the resulting deficiency. So also the federal government provides a liberal reduction in its income tax laws for those making charitable gifts, which likewise means that the consequent loss in the government's income must be overcome by a corresponding increase in the taxes of all other taxpayers. Our Commonwealth makes direct appropriations of taxpayers' money to charitable institutions. The contention, therefore, that it is unjust that the damages resulting from such an accident as that which occurred in the present instance should be borne by the taxpayers rather than by the charity is not a potent one when appraised from the broader viewpoint of an established public policy which, as thus pointed out, finds similar expression in many other ways.

Because of the views thus expressed we are of opinion that the court below was right in deciding that the City of Pittsburgh cannot recover over from the charitable Society which it brought on the record as an additional defendant.

All the judgments are affirmed.

---

Dissenting Opinion by Mr. Justice Ladner:

The city's appeal from the judgment entered for the Society on its motion for judgment n.o.v. presents a question of first impression in this Commonwealth. The lower court entered the judgment on the ground that the Society being a charitable institution was immune from liability. The city contends that the charity should not, in this instance, be permitted to invoke the immunity of charities doctrine. I agree and therefore feel impelled to dissent.

To my mind a municipality, seeking reimbursement by action over, is in an entirely different position from

that of an injured plaintiff by reason of the statutory duty imposed on property owners without exception. This statutory duty is imposed by the Act of May 16, 1891, P.L. 75, Sec. 11, 53 P. S. 771, which authorizes the municipal authorities to "require sidewalks, boardwalks and curbstone to be laid, set and *kept in repair*" and to assess the cost and collect the same by lien or action in assumpsit for the same where the work is done by the municipalities after notice to the owner is ignored, and the ordinance of Pittsburgh of 1930, No. 161, adopted pursuant thereto. That ordinance reads in part as follows: Sec. 4. "It shall further be the duty of *all owners* of property abutting or adjoining streets, to maintain all sidewalk pavements and curbing in a proper and safe condition. *In all cases* . . . where sidewalk pavements, curbing and . . . steps are not repaired or reconstructed in conformity with the requirements of this ordinance, by the owners of abutting or adjoining properties within 20 days after written notice to the owner or owners . . . the Director of the Department of Public Works is hereby authorized . . . to cause such construction to be made at the proper cost and expense of said owner . . . the cost and expense of the same shall constitute a debt, municipal claim and lien against the owner or owners, in favor of the City of Pittsburgh." (emphasis supplied)

The express duty is thus imposed upon *all* property owners whether they be charitable organizations or not, and that breach of this duty must also make all owners without exception responsible for the consequences. That conclusion logically follows from the decisions upholding municipal claims, filed against charity-owned real estate, for work done under such an ordinance notwithstanding the statutory exemption of the charity from taxes: *Wilkinsburg Bor. v. Home for Aged Women,* 131 Pa. 109, 18 A. 937 (1889). In *Phila-*

*delphia v. Pennsylvania Hospital,* 143 Pa. 367, 22 A. 744 (1891), it was held that the statutory requirement to keep sidewalks and curbs in repair is a duty imposed on the property owner which is a regulation under the police power from which even a charity cannot be excused. The statutory duty cannot be escaped by an owner in possession and though the municipality may repair and lien the premises, yet, if before that is done an injury follows because of failure to discharge that duty, the municipality, if subject to an action by reason thereof, has a recourse over to such property owner : *Brookville Borough v. Arthurs,* 152 Pa. 334, 25 A. 551 (1893) ; *Dutton v. Landsdowne Borough,* 198 Pa. 563, 48 A. 494 (1901) ; *Briggs et al. v. Philadelphia,* 316 Pa. 48, 173 A. 316 (1934) ; *Fisher et ux. v. City of Philadelphia,* 112 Pa. Superior Ct. 226, 170 A. 875 (1934) ; *Ford v. Philadelphia,* 148 Pa. Superior Ct. 195, 24 A. 2d 746 (1942). Nor is it any defense to the municipality's claim of recourse, that it did not itself make the repairs and lien the property after the owner failed to obey the notice to do so: *Ashley v. Lehigh & Wilkes-Barre Coal Co.,* 232 Pa. 425, 81 A. 442 (1911). I see no logical reason why the doctrine of a charity's immunity from liability for torts of its servants should now be extended to excuse the breach by a charity of the absolute statutory duty imposed *without exception* on *all* property owners.

The doctrine of immunity of charities has in recent years been recurrently criticized as outmoded, unrealistic, illogical, inconsistent and not in public interest,[1] but nevertheless I agree with the majority that the

---

[1] *President and Dir. of Georgetown College v. Hughes,* 130 F. 2d 810 (1942) ; 31 Harv. L. Rev. 479, 482; 54 Dickinson L. Rev. 6; 9 Pittsburgh L. Rev. 253-265 and the State of Delaware refused to follow the doctrine in the recent case of *Durney v. St. Francis Hospital,* 83 A. 2d 753.

principle is now too firmly imbedded in our law to be removed except by legislation, but that does not mean that we need *extend* the principle to cases where the charity is guilty of failure to observe a duty imposed by law under the police power of a municipality for the safety of its citizens. And, I observe, there is no surer way of bringing about the legislative abolition of the outworn doctrine of charitable immunity from tort liability than by its unrealistic extension to new fields. The trust fund theory as a basis of charitable immunity had its origin, as was pointed out by Justice RUTLEDGE in *President etc. of Georgetown College v. Hughes,* 130 F. 2d 810, 815 (1942) in the dictum of Lord Cottenham in *Feoffees of Heriot's Hospital v. Ross,* 12 Clark & Fin., 507, 518, 8 Eng. Rep. 1508 (1846), where that jurist said, "To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose." This was followed in *Holliday v. St. Leonard* (1861), 11 C.B., N.S. 192, so holding but that case and the dictum on which it rested were directly overruled by *Foreman v. Mayor of Canterbury* (1871), L.R. 6 Q.B. 214. Thus the rule is no longer law in the jurisdiction where it originated.

The modern tendency is against extending the doctrine beyond its present limits. Thus in *Winnemore v. Philadelphia,* 18 Pa. Superior Ct. 625 (1901), it was held that the rule of charitable immunity did not apply where the charity conducted a business enterprise. Nor is it applicable where it was not actually functioning at the time of the injury as a charity: *Radobersky v. Imperial Volunteer Fire Department,* 368 Pa. 235, 81 A. 2d 865 (1951). Yet in both cases the charitable enterprise concerned has but one treasury and any judgment recovered has to be paid out of the general fund.

Why was there not as much a diversion in these cases as in the other cases? Elsewhere .the tendency to restrict the immunity rule is the same: Thus in *Love v. Nashville Agri. & Normal Institute,* 146 Tenn. 550, 243 S.W. 304 (1922), it was held that a private charitable corporation cannot be exempted from liability for injuries caused by a nuisance maintained by it on the theory that its funds are held in trust for the purposes of its creation. The strict doctrine has now been either directly repudiated or so modified as to be almost beyond recognition in the majority of common law jurisdictions.[2]

The majority seeks to justify its extension of the old doctrine by pursuing the familiar patterns of argument that "Public minded benefactors are likely to have their generous impulses discouraged." This statement though oft repeated is founded upon a theoretical supposition and not upon statistics that show any drying up of the well springs of charity in four of the states that have abandoned or abolished the out-moded doctrine.[3] So the professed fear of dissipation of trust funds is more fancied than real in these modern days when that danger can be and in most cases is, easily guarded against by liability insurance to the complete protection of the charity.[4]

---

[2] See comprehensive review of the cases in *President Etc. of Georgetown College v. Hughes,* 130 F. 2d 810, 818, 819 (1942) ; Appleman, *The Tort Liability of Charitable Institutions,* 22 A.B.A.J. 48 (1936).

[3] Minnesota, New Hampshire, New York and Rhode Island. And of course the doctrine no longer · exists in England, nor in Canada nor New Zealand.

[4] In 87 U. of Pa. L. Rev. 1015, 1016, it·was well said, "There is no reason why a corporate charity should not expend a portion of its revenue in insurance and, by so doing, act in accordance with the modern tendency to spread the risk of loss upon as wide a base as possible." See also *DeFraites v. Young Men's Christian Association,* 49 D. & C. 652, 654 (1943).

416

In any event there should be no difficulty here in distinguishing between cases where the donor's right conflicts with the injured individual and where the donor's right conflicts with the general public interest. A more realistic view requires us to take into consideration the rights of the whole public. The taxpayers are entitled to consideration in the balancing of the equities of the situation. The fancied interest of benefactors of charities in cases such as this must, as a matter of public policy, give way to the greater right of the public.

In short, a sound public policy should require us to decline to extend the doctrine of immunity of charities to an action of recourse by a municipality brought to recover damages it was compelled to pay by reason of the charity's breach of duty imposed by a general law. If this makes for better care of its property the public is undoubtedly the gainer. In any event I see no great harm to charities since they can, I repeat, protect themselves by liability insurance at a modest cost as do other owners and occupiers of real property. In point of fact, in the very case before us, it was stated at the argument that the additional defendant charity is actually protected by liability insurance covering the premises here in question.

I would reverse the judgment in Appeal No. 43 and enter the same in favor of the City of Pittsburgh.

Mr. Justice JONES and Mr. Justice CHIDSEY join in this dissent.