## Knecht, Appellant, *v.* Saint Mary's Hospital.

Argued November 13, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Lee B. Sacks,* for appellants.

*John J. Tinaglia,* with him *Michael A. Foley* and *Cornelius C. O'Brien, Jr.,* for appellee.

76

OPINION BY MR. CHIEF JUSTICE JONES, March 24, 1958:

The plaintiffs, husband and wife, sued the defendant hospital for damages for injuries allegedly suffered by the wife when she fell and fractured an ankle while a patient in the hospital. The details of the accident are not presently important. The hospital raised as its defense to the action its immunity, as an eleemosynary institution, from liability for tort. The trial court entered a nonsuit which it subsequently refused to take off and the plaintiffs have appealed from the resultant judgment.

The appellants' sole argument is that this court should now repudiate the rule of immunity of charitable institutions from tort liability and remand the case to the court below for a trial on the merits as to the defendant's negligence and the plaintiffs' damages.

The immunity of an eleemosynary institution from tort liability has long been the established rule in Pennsylvania: *Bond v. Pittsburgh*, 368 Pa. 404, 84 A. 2d 328; *Siidekum, Admr. v. Animal Rescue League of Pittsburgh*, 353 Pa. 408, 45 A. 2d 59; *Gable v. Sisters of St. Francis*, 227 Pa. 254, 75 A. 1087; *Fire Insurance Patrol v. Boyd*, 120 Pa. 624, 15 A. 553; *Betts v. Young Men's Christian Association of Erie*, 83 Pa. Superior Ct. 545. The rationale of the rule lay in the bounden duty of a public charity as a trustee to apply its funds in furtherance of its beneficent purpose. As declared by this court in 1888 in *Fire Insurance Patrol v. Boyd*, supra,—"A public charity, whether incorporated or not, is but a trustee, and is bound to apply its funds in furtherance of the charity and not otherwise. This doctrine is hoary with antiquity and prevails alike in this country and in England where it originated as early as the reign of Edward V, and it was announced in the Year Book of that period."

However, the doctrine has since been abandoned in England and in a number of American jurisdictions. The confused status of the decisions among the various jurisdictions was well epitomized by Mr. Justice RUT-LEDGE, then of the United States Court of Appeals for the District of Columbia, in *President and Directors of Georgetown College v. Hughes,* 130 F. 2d 810, 812, as follows: "Paradoxes of principle, fictional assumptions of fact and consequence, and confused results characterize judicial disposition of these claims. From full immunity, through varied but inconsistent qualifications to general responsibility is the gamut of decision. The cases are almost riotous with dissent. Reasons are even more varied than results." Nonetheless, the law on this subject in Pennsylvania is clear. Charitable institutions are not subject to liability for tort. It is that rule which the appellants would have us now abandon by court decision.

The rule was most recently reviewed in the case of *Bond v. Pittsburgh,* supra, in which the opinions for both the majority and the minority were agreed that the rule should remain as heretofore short of legislative change. Mr. Chief Justice STERN, speaking for the majority, said that, "notwithstanding the violent criticisms that have been directed by academic legal writers against the doctrine of the immunity of charitable organizations from tort liability, and notwithstanding also the fact that there is considerable conflict in the judicial decisions on the subject among the several States, our own Commonwealth has, from the earliest times, stood firm in its adherence to the principle of immunity." The majority opinion further pertinently stated that "If and when there is to be any change in the doctrine of the immunity of charitable institutions from tort liability, it ought to be effected, not by the courts, but by the legislature, which is, of

course, the ultimate tribunal to determine public policy." The dissenter in the *Bond* case likewise recognized that "The doctrine of immunity of charities has in recent years been recurrently criticized as outmoded, unrealistic, illogical, inconsistent and not in public interest, but nevertheless . . . agree[d] with the majority that the principle is now too firmly imbedded in our law to be removed except by legislation . . . ."

A rule of non-liability, even though judge-made, that has become as firmly fixed in the law of this State as has the charitable immunity from tort liability, should not be abrogated otherwise than by a statute made to operate prospectively. If the rule were to be abandoned by court decision, it would lay open to liability all charities for their torts of the past that were not barred by the statute of limitations at the time of the rendition of the rescinding decision. The injustice of such an imposition of liability upon charities that theretofore had a right to rely on the rule of immunity is readily apparent. Whereas, if and when the rule is abrogated prospectively, which the legislature could provide, all charities then made subject to tort liability for the future could protect themselves by appropriate insurance. Moreover, whether, in this day of traffic hazards from automotive vehicles of charities as well as of all others, the rule as to charitable immunity should be rescinded poses a question of public policy which falls peculiarly within the competence of the legislature.

Judgment affirmed.

––––––

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The sole question in this case is whether a patient, injured in a charitable hospital, may bring an action in tort against the hospital because of asserted negli-

gence on the part of its agents, servants, or employees. The lower Court decided that recovery is barred under the decision of this Court in the case of *Bond v. Pittsburgh*, 368 Pa. 404, decided in 1951. In that case Justice STERN (later Chief Justice) said: "Notwithstanding the violent criticisms that have been directed by academic legal writers against the doctrine of the immunity of charitable organizations from tort liability, and notwithstanding also the fact that there is considerable conflict in the judicial decisions on the subject among the several States, our own Commonwealth has, from the earliest times, stood firm in its adherence to the principle of immunity."

The fact that our Commonwealth has "stood firm in its adherence to the principle of immunity" does not of itself prove that it has stood firm in law and justice. From time to time we have seen that a doctrine for which the Commonwealth stood firmly, was later proved to have a defective foundation and it finally collapsed in spite of the firm support of this Court. Thus for many decades it was the law in Pennsylvania that no recovery was possible where the plaintiff, in a railroad accident, could not specifically prove the defect in the railroad equipment which had brought about the damage of which he complained. In 1913 in the case of *Bradley v. Lake Shore and Michigan*, 238 Pa. 315, the plaintiff was struck by an iron brake bar which flew from a railroad train as he, an intending passenger, was waiting for a train. He brought an action in trespass against the railroad company but was nonsuited. This Court upheld the nonsuit with the rather unique explanation that the plaintiff was a victim of an "accident pure and simple." What is any negligence case but the result of an accident pure and simple? Forty years later, in the case of *Mack v. Reading*, 377 Pa. 135, this Court acknowledged that

no trespass case can be disposed of with the meager and naked statement that the plaintiff was injured in an "accident pure and simple." On March 22, 1954, by a unanimous decision, we repudiated the doctrine and the supposed *stare decisis* of the *Bradley* case. But in the meantime who knows how many deserving claimants were deprived of a just recompense because of the *stare decisis* of *Bradley*?

Chief Justice BROWN of this Court asserted in 1919, in the case of *Luzerne County v. Morgan,* 263 Pa. 458, that there was a duty on the part of this Court to depart from a presently-discovered improper ruling of the past: "If we should now be considerately of opinion that our predecessors erred in holding, time and again, that the legislature is not prohibited by the Constitution from designating a county officer as its agent for the collection of revenue due directly to it, and providing for compensation to be retained by him for his services as such agent, *our duty would be to so declare and to depart from their rulings.*"*

In 1926 this Court in the case of *Com. v. Sunbury Converting Works,* 286 Pa. 545, 554, overruled a previous decision because it was out of harmony with the decisions of the Supreme Court of the United States: "This somewhat elaborate review of the controlling principles and authorities, has led us, after most mature consideration, to the conclusion that Com. v. Westinghouse Air Brake Co., supra, *must be overruled.* It is out of harmony with the decisions of the Supreme Court of the United States, with those of our sister states and stands alone with us. It contravenes the public policy of the State . . ."

Of course, I do not believe that the doctrine of *stare decisis* should be lightly regarded. Without it

---

* Italics throughout, mine.

there would be no stability in the law. The ship of jurisprudence should follow that well-defined channel which, over the years, has been proved to be safe and trustworthy. But it does not comport with wisdom to say that when shoals rise in a heretofore safe course, and rocks emerge to encumber the passage, the ship should pursue the original course merely because it had presented no hazard in the past. The doctrine of *stare decisis* does not demand that we follow precedents which experience has now proved to be in violation of accepted principles of justice.

It was suggested in the case of *Bond v. Pittsburgh,* supra, that the doctrine of immunity of charitable organizations is an ancient one. It is not in fact ancient. This doctrine first entered the law of England in the case of *Holliday v. St. Leonard's,* 11 C.B. N.S. 192, 142 Eng. Rep. 769, which was itself based on the case of *Duncan v. Findlater,* 6 Cl. & Fin. 894, 7 Eng. Rep. 934, decided in *1839.* Although both these English cases were later overruled, the Supreme Court of Massachusetts adopted the repudiated doctrine in 1876 in the case of *McDonald v. Massachusetts Gen. Hosp.,* 120 Mass. 432, this being the first time the rule was recognized in American jurisprudence.

In the *Bond* case, this Court apparently considered the case of *Fire Insurance Patrol v. Julia F. Boyd,* 120 Pa. 624, which was decided in 1888, as the first announcement of the charitable institution immunity doctrine in Pennsylvania.* But is 1888 so geologically remote as to justify this Court's assertion that the doc-

---

* The Boyd Opinion mentions the case of *Patterson v. Reform School,* 92 Pa. 229, as one declaring that a charitable trust is not liable in tort. It is dated 1879 and held that the Pennsylvania Reform School was a public corporate body and could not be proceeded against by levari facias.

trine is "deeply imbedded in the structure of our Common Law?"

But even if we were to assume that 1888 represents antiquity, we still would be required to ascertain if a rule of 1888 applies to a world of 1958. While age adds venerableness to moral principles and physical objects, it sometimes becomes necessary, and it is never sacrilegious to do so, to scrape away the moss of the years to study closely the thing which is being accepted as authoritative, inviolable, and untouchable.

The phrase "charitable organization" is not technically a synonym for charity, and I emphasize that I do not mean this in any derogatory sense. The person who gives and does not receive typifies the virtue of charity. An institution which serves and does not collect is charity in action. But while an institution which charges for its services may be charitable in that it gives more than it is paid for, it still cannot be classified as a temple of pure charity, that is, one exempt from man-made obligations which apply to all other persons and establishments.

One who is the object of charity is entitled, even though he makes no expenditure for it, to that treatment and consideration which go with fair and humane conduct between members of the human race. And if the poorest person may receive considerate treatment, certainly the individual who does pay something for services rendered should not fare worse than the indigent recipient of his brother's bounty.

The plaintiff in this case was a paying patient. She expended money for hospital care. She was injured when hospital employees, who prescribed certain weakening drugs, directed her to walk. Obeying their instructions she fainted, fell, and fractured an ankle. She sued the hospital alleging negligence. She was nonsuited, not because she failed to prove negligence or

because there was evidence of contributory negligence. She was nonsuited only because the hospital was classified as a charitable institution. She appealed to this Court which has affirmed the nonsuit. I dissent from this affirmance.

If Mrs. Knecht had been injured in a railroad station, office building, meeting hall, street car, elevator or any other place where she had the right to be, she would have been entitled to a jury trial on the issue of the defendant's alleged negligence. It is not enough, as I view the picture, to deny Mrs. Knecht a jury trial on the bare assertion that the defendant is a charitable institution. Why does that, of itself, make it immune to a liability which attaches to all other institutions and individuals in the Commonwealth?

The very concept of immunity from tort responsibility runs counter to the bedrock principle of true democracy, that all persons stand equally before the law. If a charitable institution is to be exempt from liability for its torts, why should a motorist who gives a friend or even a stranger a ride in his car be liable to that guest if he mismanages the car and injures him? Is he not also engaged in a charitable act?

In Corinthians, I, xiii, 13, we find this deathless and incontrovertible truth: "And now abideth faith, hope, charity, these three; but the greatest of these is charity." But this means charity in the absolute: charity that provides shelter, supplies food, administers comfort, encourages the depressed—not charity which injures, cripples, or torments.

It is argued by those sustaining the immunity rule that the good Samaritan who takes a stranger to his home should not be liable if his servants injure the stranger. But if the good Samaritan negligently pushes the wounded wayfarer down the cellar stairs, thus adding to his injuries, it might have been more charitable,

in the long run, if he had left the traveller on the highway to be rescued by one with a steadier hand. The person who does good in a wrong way can accomplish as much harm as the person who does wrong in an efficient manner.

The law at one time proclaimed and upheld the rule (proved a million times to be wrong) that the king can do no wrong. In America the rule was changed to read that the government can do no wrong. Now it is said that hospitals can do no wrong, but in the meantime unoffending persons are being injured, crippled, and even killed through the negligence of government employees and hospital employees; and recovery is being denied the victims or the victims' families on so-called rules of immunity which have no place in a code of equality and justice.

It is historically true, and it is a tribute to the soundness of the human heart that it *is* true, that there was a time when good men and women, liberal in purse and generous in soul, set up houses to heal the poor and homeless victims of disease and injury. They made no charges for this care. The benefactors felt themselves richly rewarded in the knowledge that they were befriending humanity. And if it happened that some poor mortal was scalded by a sister of mercy who, exhausted from long hours of vigil and toil, accidentally spilled a ladle of hot soup on a hand extended for nourishment, there was no thought of lawsuits against the philanthropists who made the meager refuge possible. But if, following such a mishap, litigation should have been initiated in the courts, it is not difficult to understand why judges would be reluctant to honor such a complaint on the basis that an enterprise utterly devoid of wordly gain should be exempt from liability. A successful lawsuit against such a feeble structure might well have demolished it and have thus para-

lyzed the only helping hand in a world of unconcern for the rag-clothed sick and the crutchless disabled.

The situation today is quite different. Charitable enterprises are not housed in log cabins, frame dwellings, or storm shelters at the foot of mountains. Brick, stone, marble and glass rise in mighty edifices to receive and care for the ill and the wounded. Large staffs, the best of equipment, and the most modern business methods feature these splendid institutions which are devoted to the noblest purpose of man, helping one's stricken brother. Many of these institutions receive financial aid from public spirited citizens as well as from the government, but they still are operated on a business basis—they have to be, not only so that the institution may survive but so that the patient may live. Accordingly, charges are made for services rendered and when bills are not paid, the law is resorted to for collection.

Is it fair, then, for one who has been injured in such an institution, through the negligence of an employee, to be denied compensation for his injuries on the basis that the hospital is immune from tort action? If a hospital nurse negligently leaves a sponge in the abdominal cavity of a paying patient, why should the hospital be exempt from liability, any more than a restaurant owner should escape liability for the damage inflicted by a waitress who negligently overturns a tray of dishes on a guest?

Another flagrant inconsistency in the law of tort immunity lies in the fact that a charitable institution may be sued for maintaining a nuisance and may be required to pay damages resulting from maintaining a nuisance. (25 A.L.R. 2nd 52). If it can thus be held liable for damaging the property of others, why should it not be amenable to liability for injuring the physical bodies of others?

It is argued that a successful lawsuit against a charitable hospital might endanger its financial standing. The man who has a legitimate action against a railroad company is allowed to recover even though the payment of a resulting verdict might bankrupt the railroad. It is for the railroad company to decide how it shall pay. It is not for the court to weigh the benefit to the railroad company's victim against the possible curtailment of train service. The curtailment of train service is something to be considered by other agencies of government. The same is true of hospitals. If payment of damages reduces services offered by a hospital it is for the hospital authorities to devise ways and means of obtaining the funds required for the continuing and efficient functioning of the hospital. It is also a matter of community responsibility. In fact that very responsibility has been recognized everywhere in America. Legislatures approve appropriations for hospitals, community fund drives collect money for hospitals, generous testators leave splendid legacies of money to hospitals.

But, aside from all this, the payment of damages to injured patients would not create the fiscal ogre pictured by some advocates of the immunity theory. Nor can it sensibly be feared, although it has indeed been so argued, that if hospitals are compelled to liquidate damage claims this will mean an increase in causes for lawsuits. It cannot reasonably be contended that with the overruling of the immunity doctrine, patients will throw themselves from their beds, burn themselves with X-ray machines, rip off bandages, break plaster of Paris casts, and take the wrong medicine in order to further disable themselves and thus collect money damages. No sane person would prefer money to a sane and healthy body, free of pain, agony, and torment.

And then it is said that if hospitals would be financially responsible for the negligence of their employees, this would increase the running expenses of the hospital. This surely can not be offered as a sound reason for immunity. There is nothing in the history of the times which would suggest that hospitals, in company with the butcher, baker, and candlestick maker, would hesitate to increase rates to meet pecuniary responsibilities in this regard or any regard. But hospitals would not need to increase their rates exorbitantly. Insurance coverage would considerably lessen the burden of meeting damage verdicts. Justice RUTLEDGE of the U. S. Court of Appeals for the District of Columbia, in the case of *Georgetown College v. Hughes,* 130 F. 2d 810, spoke with perspicacity, wisdom, and reserved foresight on this subject as follows: "No statistical evidence has been presented to show that the mortality or crippling of charities has been greater in states which impose full or partial liability than where complete or substantially full immunity is given. Nor is there evidence that deterrence of donation has been greater in the former. Charities seem to survive and increase in both, with little apparent heed to whether they are liable for torts or difference in survival capacity.

"Further, if there is danger of dissipation, insurance is now available to guard against it and prudent management will provide the protection. It is highly doubtful that any substantial charity would be destroyed or donation deterred by the cost required to pay the premiums. While insurance should not, perhaps, be made a criterion of responsibility its prevalence and low cost are important considerations in evaluating the fears, or supposed ones, of dissipation or deterrence. What is at stake, so far as the charity is concerned, is the cost of reasonable protection, the

amount of the insurance premium as an added burden on its finances, not the awarding over in damages of its entire assets."

In the same *Bond* case in which Chief Justice STERN spoke for the majority of this Court, a well-reasoned Dissenting Opinion, authored by Justice LADNER and joined in by two members of the present Court (Chief Justice JONES and Justice CHIDSEY) also pointed out that many of the fears expressed over abandonment of the immunity doctrine are exaggerated. Said Justice LADNER: "The professed fear of dissipation of trust funds is more fancied than real in these modern days when that danger can be and in most cases is, easily guarded against by liability insurance to the complete protection of the charity."

The Majority Opinion asserts that if the doctrine of immunity is to be changed in Pennsylvania it must be done by the Legislature. I deplore with the Majority a judicial donning of the legislative mantle and have had occasion to point out on an occasion or two heretofore, where I believed this Court sat as an extraordinary Senate body rather than as an appellate tribunal. But the doctrine of charitable immunity was not initiated by the Legislature. This Court brought it into being and this Court can repudiate it. Whether the first case which announced the rule justified its promulgation is something only of historical value, whether its continued existence since 1888 was warranted is a topic for academic discussion alone, but whether it meets present day conditions is a matter of imperative and immediate concern to the science of the law and the dictates of justice.

The defendant hospital argues that the silence of the Legislature on this subject is evidence that it is satisfied with what this Court has said on the immunity of charitable institutions. In its brief it specifi-

cally asserts: "Through all of the sixty-nine years that the doctrine has existed, the legislature has taken no action to overturn it. By its silence, its approval may well be inferred."

But I should like in this connection to offer the observation that the Legislature has other things to do besides raking through the leaves of the State Reports to discover which ones should be incinerated. Moreover, it has happened in the past that this Court, through a decision, has curved the highway of the law around a barrier placed there by the Legislature and when the Legislature attempted to eliminate the diversion, this Court has rebuilt the circumlocution. I particularly refer to this Court's arbitrary interpretation of the Act of May 14, 1925, by allowing the jury in murder trials to consider irrelevant but damaging testimony on the defendant's previous record in arriving at a conclusion as to whether he did or did not commit the murder with which he currently stands charged.*

The fact that the Legislature took no action on the subject of immunity for charitable institutions prior to 1889 may be accepted as evidence that it did not favor the immunity. Its silence since 1889 may be interpreted as a reluctance to interfere with the courts

---

*In 1924, in the case of *Com. v. Parker*, 294 Pa. 144, this Court, speaking through Chief Justice MOSCHZISKER, gave the Act of 1925 an interpretation which cannot be supported in law, logic, or reason. It has gone on affirming the misinterpretation. The Legislature attempted to correct the misinterpretation, but this Court insisted on pursuing the erratic course marked out by Chief Justice MOSCHZISKER. And in the recent case of *Commonwealth v. Thompson*, 389 Pa. 382, it said that if any change is to be made in the doctrine laid down in *Com. v. Parker*, the change must be made by the Legislature, overlooking that it was this Court and not the Legislature which brought about the doctrine which now so obviously needs correction.

which closed the gates to litigation of this character. Those gates can be easily opened again by a simple pronouncement of this Court.

The Majority Opinion says that it would be unfair for the Courts to abrogate the rule because "it would lay open to liability all charities for their torts of the past that were not barred by the statute of limitations at the time of the rendition of the rescinding decision." But if, in fact, the rule is unjust, it is the duty of the Court to rescind it on the basis of principle, and not of expediency. As the Majority believes it to be unfair to subject institutions to litigation over injuries which have not been barred by the Statute of Limitations, it is unfair also to those who are entitled to redress to be denied an opportunity to seek that redress.

The State of New York did not find it unjust or unfair to abrogate the doctrine, even though it had been the law of that State for many years. In the case of *Bing v. Thunig*, 2 N. Y. 2nd 656, the plaintiff was severely burned during the course of an operation because of the alleged negligence of hospital personnel in the operating room. He brought an action in tort against the surgeon and the hospital and recovered a verdict against both. The Appellate Division of the Supreme Court of New York held that a charitable hospital was not responsible for the negligence of its physicians and nurses in the treatment of patients, and reversed the verdict on the authority of *Schloendorff v. New York Hospital*, 211 N. Y. 125, decided in 1914. The plaintiff appealed to the New York Court of Appeals,* which overruled the *Schloendorff* decision, an-

---

* Because of a terminology which seems to collide with the accepted meaning of words, the Supreme Court of New York is not the supreme court of the State; and the magnificent-sounding, presumably ultimate tribunal known as the Appellate Division of the Supreme Court is still inferior to the simple Court of Appeals.

nouncing that "the hospital's liability must be governed by the same principles of law as apply to all other employers."

In a brilliant opinion whose logic marches with the stately and solid trend of the Roman phalanx of old, Judge Fuld, speaking for the Court of Appeals, declared: "Although we have hitherto refrained from pronouncing 'the ultimate fate' of the *Schloendorff* rule, . . . we have long indicated our dissatisfaction with it, and only last year, in further expanding the hospital's liability, the court posed this searching and suggestive question . . .: 'What reason compels us to say that of all employees working in their employers' businesses (including charitable, educational, religious and governmental enterprises) the only ones for whom the employers can escape liability are the employees of hospitals?'

"The doctrine of *respondeat superior* is grounded on firm principles of law and justice. Liability is the rule, immunity the exception. It is not too much to expect that those who serve and minister to members of the public should do, as do all others, subject to that principle and within the obligation not to injure through carelessness. It is not alone good morals but sound law that individuals and organizations should be just before they are generous, and there is no reason why that should not apply to charitable hospitals. 'Charity suffereth long and is kind, but in the common law it cannot be careless. When it is, it ceases to be kindness and becomes actionable wrongdoing' . . . Insistence upon *respondeat superior* and damages for negligent injury serves a two-fold purpose, for it both assures payment of an obligation to the person injured and gives warning that justice and the law demand the exercise of care."

The upholders of the immunity rule in the New York case did not fail to fire the heaviest artillery which is available to those who would perpetuate the rule, namely, that if the change is to be made it must be made by the legislature. Judge FULD replied to that broadside with unanswerable grapeshot of reasoning: "To the suggestion that *stare decisis* compels us to perpetuate it until the legislature acts, a ready answer is at hand. It was intended, not to effect a 'petrifying rigidity', but to assure the justice that flows from certainty and stability. If, instead, adherence to precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to survive, and no principle constrains us to follow it. On the contrary, as this court, speaking through Judge DESMOND in Woods v. Lancet (303 N. Y. 349, 355), declared, we would be abdicating 'our own function, in a field peculiarly nonstatutory,' were we to insist on legislation and 'refuse to reconsider an old and unsatisfactory court-made rule.'"

The learned Judge WEINROTT in the Court below in the case at bar who wrote the opinion for the Court en banc, filed a Supplemental Opinion in which he referred to the *Bing v. Thunig* case which had not been promulgated when he filed his original opinion. It is gratifying to note that, with the praiseworthy candor which I always associate with Judge WEINROTT, he said in his Supplemental Opinion: "Frankly, had I had the benefit of that Opinion, which postdated mine by six days, I might very well have changed my sights and become fully realistic."

Judge WEINROTT was unable to adopt realism because of chronology and possibly also because of the barriers of *stare decisis* which require a lower Court to stay within the boundaries of the policy marked out by this Court. But there is no such restriction on this

Court itself. What this Court has done, if it is wrong, it can undo.

The scholarly and acutely observant Chief Judge BIGGS of the United States Court of Appeals (Third Circuit), saw in the *Bing v. Thunig* decision a lighthouse of reasoning to illumine the troublesome passage of this State from the immunity rule into the tranquil waters of non-immunity. (It is difficult for individuals, and not any less so, for Courts, to admit a change of view.) In the case of *Brown v. Moore,* 247 F. 2nd 711, Chief Judge BIGGS wrote: "It is possible of course in view of the Bing decision of the Court of Appeals of New York—a court whose decisions we believe to have great weight with the Supreme Court of Pennsylvania—that that Court might adopt the enlightened rule of the Bing case in respect to both public and private hospitals. Other strong courts have adopted a similar rule."

But we now see from the Majority decision in the case at bar that Biggs' conditional prophecy did not quite reach the level of his soaring hopes.

Other courts have negotiated, without shipwreck of principle or prestige, the straits of transition from immunity to non-immunity. The Supreme Court of Washington, in the case of *Pierce v. Yakima Valley Memorial Hospital Assn.,* 43 Wash. 2d 162, 167, said: "Ordinarily, when a court decides to modify or abandon a court-made rule of long standing, it starts out by saying that 'the reason for the rule no longer exists.' In this case, it is correct to say that the 'reason' originally given for the rule of immunity never did exist."

Judge BIGGS quoted the above paragraph in his Opinion in the *Brown v. Moore* case, and sententiously added: "We agree with the view that the reason originally given for the rule of immunity never did exist but it has stood for some eighty years in State courts.".

I believe that eighty years is long enough to follow the wrong star.

I believe that the time has come to accept the surrender of the immunity rule, with all the honors of war. It can no longer fly the flag of justice, fairness, or consistency.

I believe that it is wrong for this Court to expect the Legislature to do what, in a full discharge of its responsibilities, it should do itself; I believe it is wrong for this Court to support two inter-clashing rules of *respondeat superior;* I believe it is wrong to stand on a platform of precedent which daily sinks deeper into the quicksands of non-reality.

I dissent.

———

DISSENTING OPINION BY MR. JUSTICE COHEN:

I am not so wedded to the rule of *stare decisis* that I would join in the application of an archaic rule and thus reach an inequitable conclusion.[1]

The immunity of charitable institutions from liability for the negligence of their employes is *court-made* law based upon erroneous, illogical and indefensible principles. The theory has been denounced in legal journals and criticized in earlier opinions of this Court. Even the majority does not support the doctrine on its merits.

The general dissatisfaction with the theory of charitable immunity has led *courts* which earlier adopted

———

[1] "It is a maxim among lawyers, that whatever hath been done before may legally be done again: and therefore they take special care to record all the decisions formerly made against common justice and the general reason of mankind. These, under the name of precedents, they produce as authorities, to justify the most iniquitous opinions; and the judges never fail of directing accordingly." Jonathan Swift in Gulliver's Travels. (Modern Library Edition).

the doctrine to abandon it. In fact, the very court which created the theory has repudiated it. Since the date of lower court's decision in this case the Court of Appeals of New York has deserted the doctrine and held hospitals liable for damage caused by the negligence of their employes.

The present majority of this Court refuse to discard the rule, and instead suggest that any repeal be made by the legislature so as to be prospective in effect. They fear that severe financial injury will be done to charitable institutions which relying on our previous decisions, have not thought it necessary to insure against liability for negligent injuries. I believe this position to be incorrect.

Experiential data in support of the majority's predictions are conspicuously missing from its opinion. The majority has pointed to no examples of serious injuries to charities in jurisdictions in which the rule of immunity has been judicially abrogated. In any event, the Statute of Limitations which bars recovery for negligent injuries occurring more than two years prior to the institution of suit will effectively serve to check a flood of litigation. Furthermore, practitioners know that many charities have voluntarily undertaken to purchase liability insurance in which the insurer agrees not to plead the defense of charitable immunity. Other charities have taken out insurance against liability without such agreement in anticipation of a change in the law. These practices would greatly reduce the adverse financial impact on charities which might result from a reversal of our position. They also indicate to me that charitable institutions recognize their responsibility to the public, even if this Court does not.

Assuming *arguendo* that charities will suffer grave financial hardship if we do repudiate the doctrine of

immunity, I am persuaded that they should bear such loss. In choosing the party to suffer the pecuniary distress which results from negligent injuries—charitable institutions which are not insured against legal liability or individuals who are not insured against financial loss—I believe we are compelled to decide against the charities by a fundamental principle of our jurisprudence—the party whose blameworthy conduct has caused injury to another must compensate the innocent and injured party therefor. By deciding to await possible legislative change so as to avoid imposing liability on charities for negligence which has occurred in the past two years, the majority continue to permit unprotected individuals to suffer undeserved financial loss for the indefinite future.