# Eckert *v.* Merchants Shipbuilding Corporation, Appellant.

*Negligence—Crossing—Usual or customary crossing—Attributes of public crossing—Contributory negligence.*

1. Where a crossing over a public street from one part of a manufacturing plant to another is much used by the employees of the plant, and has the attributes of a public crossing, a driver of an automobile employed by the company owning the plant and familiar with the works, will be deemed to have knowledge of the character and use of the crossing.

2. In such case the driver is bound to observe the same degree of care as would be required at an ordinary street crossing.

3. When he saw that a team headed in the same direction as himself had stopped a few feet from the crossing to permit a pedestrian

to pass, he was bound either to stop when he saw the team, or to have his car under such control as he passed the team, that he could stop on the shortest possible notice, or otherwise safeguard the pedestrian crossing in front of the team.

4. The pedestrian who was injured cannot be charged with contributory negligence, inasmuch as he had the right to cross the street where he did and when he did, and to rely on the driver of the automobile not running him down.

*Negligence — Automobiles—Ownership—Relations between two corporations—Principal and agent—Respondeat superior.*

5. That defendant in an accident case was an agent acting for another is no defense where the suit is to recover for the defendant's own tort or the tort of his own servant.

6. Such rule applies not only where the defendant is a natural person, but also where defendant is a corporation.

*Negligence — Independent contractor — Principal and agent — Master and servant—Hiring workmen—Control over workmen— Torts—Question for court or jury.*

7. While the status of one performing an undertaking for another may not be precisely that of an independent contractor, yet where he hires, pays, discharges and controls the workmen, he will be liable for their torts.

8. Where a contract between the United States Shipping Board Emergency Fleet Corporation and a shipbuilding company, made during the war period, gave to the latter the right to "organize a force of workmen, superintendents and the administration necessary to carry out to completion the building of the vessels," and also the entire control over the employees, to hire, discharge and pay them, the company and not the Fleet Corporation will be liable for an injury negligently caused by one of its employees in the course of his employment.

9. In such case the fact that the Fleet Corporation contributed the money to pay the wages, is immaterial.

10. In seeking the solution of the problem as to who is the master of a given servant, the real touchstone is to be found in the answer to the question, who exercised control over him?

11. The question whether the relation of master and servant existed between two persons, is one for the court alone, in any case where the answer depends upon the meaning of a written contract.

12. Otherwise that question is one of fact for the jury, whenever the evidence is adequate to support the inference that the relation existed as alleged, or where the evidence as to the material circumstances is conflicting.

## 342 ECKERT *v.* MERCHANTS SHIPBUILDING CORP.

Argued March 26, 1924.  Appeal, No. 291, Jan. T., 1924, by defendant, from judgment of C. P. No. 1., Phila. Co., Sept. T., 1919, No. 5248, on verdict for plaintiff, in case of Robert Eckert v. Merchants Shipbuilding Corporation.  Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.  Affirmed.

Trespass for personal injuries.  Before MCDEVITT, J. The opinion of the Supreme Court states the facts.

Verdict for plaintiff for $12,000, on which judgment was entered for $6,000.  Defendant appealed.

*Errors assigned* were various instructions and refusal of judgment for defendant n. o. v., quoting record.

*Wm. W. Smithers,* for appellant.—There was no evidence of any negligent act by the driver of the automobile contributing to the accident: Zenzil v. R. R., 257 Pa. 473.

The evidence of plaintiff and his witnesses established his contributory negligence: Warruna v. Dick, 261 Pa. 602.

Binding instructions in favor of defendant should have been given because by documentary evidence it was established that the relation between the driver of the automobile and defendant was not that of master and servant, that defendant was only vice-principal of the driver's employer, the Emergency Fleet Corporation, and, therefore, the rule of respondeat superior could not be applied to sustain the case: Blake v. Ferris, 5 N. Y. 48; Stone v. Cartwright, 6 T. R. 411; Lane v. Cotton, 12 Mod. 488; Wray v. Evans, 80 Pa. 102; Erie v. Caulkins, 85 Pa. 247; Edmundson v. P. M. Y. R. R., 111 Pa. 316.

*Lincoln L. Eyre,* for appellee.

OPINION BY MR. JUSTICE SCHAFFER, April 28, 1924:

Plaintiff was employed either by defendant, or the United States Shipping Board Emergency Fleet Corporation, or both, and was injured by an automobile, driven by another employee of one, or the other, or both of these corporations. He recovered a verdict against the Merchants Corporation, which ripened into judgment, from which it appeals, maintaining nonliability, because, (1) it was but the agent of the Fleet Corporation and not the master of the chauffeur, and, (2) even if otherwise responsible, it was not shown that defendant was negligent, or the testimony disclosed appellee was contributorily negligent.

Appellee was employed at a shipyard, operated by defendant, under a contract with the Fleet Corporation. The force engaged was large, numbering from 10,000 to 12,000. When his day's work had terminated, plaintiff left the part of the plant where he was employed and proceeded along a public street which divided it, to a point opposite a gate known as gate number 4. He was in a group of fellow workmen, and, when they reached the point in the footway alongside this gate, they turned to cross the street, over a crossing denominated by appellant's counsel as "an alleged customary crossing," by appellee's advocate as "an admitted regular crossing," and shown by the testimony to be a way which led from the gate named, "across the street over to another plant they had, into an entrance called the assembling yard" used by the employees as "the usual crossing," and known to be so used. From the testimony, we conclude the way was much travelled by the employees passing from one part of the plant to the other, that it had the attributes of the ordinary public crossing of a highway, and, that its character and use were or should have been known to the driver of the automobile which injured plaintiff.

Having arrived at this crossing, appellee and those with him stopped to allow a motor bus to go by, and, as

they did so, a double team, approaching in the opposite direction from the motor bus, but in the same direction as the automobile which caused plaintiff's injury, halted a few feet from the crossing to allow plaintiff and those with him to cross over. Plaintiff was ahead. He had observed the automobile about 200 feet from the crossing. As he walked in front of the team, and before he had passed the second horse, the automobile ran around the left side of the standing team and struck and seriously injured him. On the sides of the car were the initials of the United States Shipping Board Emergency Fleet Corporation and of the defendant company and it was driven by one employed at the plant, familiar with the situation; he was hurrying to take another person to a train. He disregarded the standing team and plaintiff and those with him, who were using or intending to use the crossing, and did not sound his horn as he approached. Under the circumstances and considering the customary and large use of the way, the driver was bound to observe the same degree of care as would be required at an ordinary street crossing, and to either stop, when he saw the stationary team, or have his car under such control as he passed it, that he could have stopped it on the shortest possible notice, or otherwise have safeguarded plaintiff in the highway in front of him: Twinn v. Noble, 270 Pa. 500, 503; Mooney v. Kinder, 271 Pa. 485, 488; Rankin v. Ward Baking Co., 272 Pa. 108, 110; Rosenthal v. Phila. Phonograph Co., 274 Pa. 236.

Appellant contends that plaintiff was contributorily negligent. This could not be so, as he had the right to cross the street where he did and when he did and to rely on the driver of the automobile not running him down. While it is set up that he suddenly stepped into the highway in front of the car, the weight of the evidence was to the contrary.

It is not denied that the driver of the automobile was employed by whichever corporation in legal contempla-

tion was operating the plant and in control of those there employed, and it is admitted that at the time he was on his employer's business. This brings us to the question of defendant's responsibility for the chauffeur's act. Was it, in carrying on the business in which it was engaged, such an agent of the United States Shipping Board Emergency Fleet Corporation as not to be responsible for the torts of those employed in the enterprise, as its counsel argues, and was the driver of the automobile, the employee not of appellant but of the Fleet Corporation?

The contract between the two companies calls the defendant the agent of the Fleet Corporation. This of course does not determine the matter. It recites that defendant owns certain tracts of land with the buildings and equipment thereon and that the Fleet Corporation proposes to have constructed 40 cargo vessels; that defendant agrees to erect on its land a shipyard for their construction and to build the ships and will organize the laboring, superintending and administrative force necessary to accomplish the result in accordance with the plans and specifications of the Fleet Corporation. It was provided that materials for the building of the shipyard and the construction of the vessels, all labor and other service rendered, should be paid for by defendant, from funds deposited to its credit by the Fleet Corporation, the sums deposited to be drawn by checks countersigned by an official of the latter. The Fleet Corporation had the right to make reasonable alterations, additions and substitutions in the plan "not materially affecting the general design." Defendant was required to keep accounts to show the actual cost of the vessels, and was to be paid, what was termed a "fee" for their construction, based on a schedule of the estimated cost of each. On this basis, the fee for the construction of each ship was $64,000 which was to be lowered or raised, depending on actual costs, but never to be less than $50,000 per vessel. The Fleet Corporation reserved the right to con-

trol all orders for materials, machinery, equipment, supplies and other purchases or in its own name to make such purchases. It could employ inspectors to supervise and assist in the construction of the vessels, to one of whom questions were to be referred arising at the shipyard under the contract, whose decisions, under certain circumstances, were to be binding. There was a further provision that, in the case the parties failed to agree as to any matter connected with the contract "or as to the manner of doing the work provided for hereunder or as to the materials used," the decision of the general manager of the Fleet Corporation should be final, except in certain instances, when disputes were to be submitted to three naval architects or engineers, one selected by each party and the third by these two, whose decision was to be conclusive.

Under the terms of the contract, the right to hire and discharge employees was in the defendant. The Fleet Corporation upon delivery to it of the vessels afloat was to be responsible for their safety; prior to that event, their safety was at least impliedly chargeable to appellant. In the event of failure of defendant to go forward with the work and to make progress toward completion to the satisfaction of the Fleet Corporation (but not until such default took place), the latter had the right to take possession of the shipyard, and the vessels, and to proceed with their construction, paying the costs incurred, a portion of the "fee" and the rental of the real estate. The Fleet Corporation in its discretion promised to give such assistance as it could in securing and retaining the labor necessary for the work. It may be true, as urged by appellant, that the Fleet Corporation exercised some control over various of the activities connected with the building of the ships; in the main, however, it was concerned only with results. There can be no question that in all essential respects the defendant directed the method and manner of performance of the work and

organized, employed, paid and had full control over the workmen.

From the foregoing recital of the terms of the contract, it is manifest, either that the defendant was an independent contractor for the building of the shipyard and the construction of the ships, because it organized, employed, paid and had full power to control the workmen (Simonton v. Morton, 275 Pa. 562) and so was liable for its, an independent contractor's, servants, or defendant was such an agent for that purpose as to be responsible for the chauffeur's acts done within the course of his employment, because it directly employed him and exercised complete control over his work. That a defendant was an agent acting for another is no defense in a suit to recover for his own or his servant's torts: Hindson v. Markle, 171 Pa. 138, 145; Rice v. Yocum, 155 Pa. 538; Corliss v. Keown, 207 Mass. 149; Bell v. Josselyn, 3 Gray (Mass.) 309; Horner v. Lawrence, 37 N. J. L. 46; Bates v. Pilling, 6 B. & C. (K. B.) 38; Bennett v. Bayes, 5 H. & N. (Exch.) 391. It would seem that some confusion of thought arises from the fact that the defendant is a corporation. If an individual employs one as his agent to operate an automobile, he is responsible for the latter's torts committed within the scope of his employment under the respondeat superior doctrine, but this does not mean that the agent is not liable. If an individual were employed to operate a shipyard and in operating it committed a tort, he could not successfully answer a claim for liability with the statement "sue my principal, not me." It is a little difficult to see why a corporate agent should be in a better position than a natural person under such circumstances; more particularly when it is recalled that all corporate activity is, from its nature, vicarious. For an interesting historical review of the change of the original common law doctrine that a servant was not personally responsible for his torts to the modern view that he is, see Street's Foundations of Legal Liability, vol. 2,

page 444 et seq. It is not necessary to decide whether defendant was an agent of, or independent contractor with, the Emergency Fleet Corporation for the construction of the ships. Irrespective of what the strict relation between the two companies was, appellant undeniably had such dominion over and direction of the workmen employed in the plant as to make it responsible for their acts done in the course of its business. Even where the status of one performing an undertaking may not be precisely that of an independent contractor, yet where he hires, pays, discharges and controls the workmen, he will be liable for their torts.

Defendant's counsel argues the proposition as though appellant were merely a hirer of laborers for a master, quoting the language of Stone v. Cartwright, 6 T. R. 411, "It was never heard of that a servant who hires laborers for his master was answerable for all their acts." The contract shows the defendant was far more than a mere agent to hire laborers and servants; it was, in the language of the writing, to "organize a force of workmen, superintendents and the administration necessary to carry out to completion the building of the vessels." It was given entire control over the employees, to hire, discharge and pay them, the Fleet Corporation promising to assist, if necessary, in securing and retaining an adequate force. That the Fleet Corporation furnished the money for the wages does not answer the claim of defendant's liability; if it did, then in every cost plus contract, where capital is supplied by him who contracts for performance with another, he for whom the work is being done would be responsible for the performer's negligent acts and those of his workmen, and the party actually doing the work would not be liable for his servants' torts.

In seeking a solution of the problem as to who is the master of a given servant, the real touchstone is to be found in the answer to the question, Who exercised control over him? This, as stated in Labatt's Master &

Servant, 2d ed., vol. 1, sec. 18, is the most important consideration, and all other elements, "even those which are normal and customary incidents of contracts of service, are, in an evidential point of view, material only in so far as they may tend more or less strongly, under the given circumstances, to show that the alleged master exercised control over the alleged servant." In McColligan v. Penna. R. R. Co., 214 Pa. 229, we had occasion to consider what is necessary to establish the relation of master and servant. There it was said: " 'A master is one who stands to another in such a relation that he not only controls the results of the work of that other, but also may direct the manner in which such work shall be done.' [There is no question under the evidence in the case at bar but that the chauffeur was subject to the direction of the defendant.] 'The relation of master exists where the employer has the right to select the employees, the power to remove and discharge him, and the right to direct both what work shall be done and the way and manner in which it shall be done' [all these elements were in the defendant's hands]: 20 Amer. & Eng. Ency. of Law (2d ed.), pages 11, 12. The relation exists when the master not only has the right to select his servant, but has the power to remove and discharge him, with or without cause, and to direct what shall be done and the manner of doing it." There is no doubt in the pending case that the defendant had the right of selection and the power referred to. Wray v. Evans, 80 Pa. 102, is to the same general tenor. "It is essential to the relation of employer and employee......that the employer shall have power and authority to direct and control the acts of the alleged employee. Having this power, the employer must respond; lacking it, he is not to be held accountable. Respondeat superior is the foundation of liability; and if the employer or principal is without power to command or direct the acts of the alleged employee or agent, there is no superior whose duty it is to respond for the acts of an inferior. It has

been said: 'The relation between parties to which responsibility attaches to one for the acts or negligence of the other must be that of superior and subordinate, or, as it is generally expressed, of master and servant, in which the latter is subject to the control of the former. The responsibility is placed where the power exists. Having power to control, the superior or master is bound to exercise it to the prevention of injuries to third parties, or he will be held liable'": 18 Ruling Case Law, page 782. "The question which of two or more persons was the master of a certain employee may sometimes be solved by considering which of those persons was bound to perform the particular piece of work in which the employee was engaged at the given time": Labatt's Master & Servant, 2d ed., vol. 1, sec. 24. Applying this test, there can be but one answer and that is that the appellant was bound to perform the work provided for under the contract.

A careful reading of all the testimony, and of the lengthy contract between the Emergency Fleet Corporation and defendant, convinces us that the latter was the real operator of the shipyard, that all of the employees therein were its servants and subject to its control, and that the terms of the contract on which appellant relies for its claim of immunity provide no more than that the Fleet Corporation reserved a certain supervision over the work for the purpose of insuring completion thereof and that certain other provisions to which reference is made by appellant were proposed to facilitate performance by the defendant under the pressure of existing war conditions.

Whether the driver of the automobile was the servant of the defendant company was not ascertainable entirely from the contract; the testimony of witnesses as to this was to be considered. The court below, therefore, was not mistaken in leaving it to the jury to say whether the relationship existed, although we think the court could properly have instructed them as a matter of law, that

the defendant was the master of the chauffeur under the contract. "The question whether the relation of master and servant existed between two persons is one for the court alone in any case where the answer depends upon the meaning of a written contract. Otherwise, that question is one of fact for the jury,......whenever the evidence is adequate to support the inference that the relation existed as alleged, or where the evidence as to the material circumstances is conflicting": Labatt's Master & Servant, 2d ed., vol. 1, sec. 17.

Being of opinion that there is warrant in the record for the determination that defendant was responsible for the chauffeur's acts, and that the latter's negligence caused the plaintiff's injury, that there was no reversible error on the trial, and that the questions at issue were properly submitted to the jury, it follows the assignments of error must be overruled and the judgment affirmed.