Michael **MATONTI**

v.

**RESEARCH–COTTRELL, INC.**

**Civ. A. No. 24798.**

United States District Court
E. D. Pennsylvania.

Jan. 31, 1962.

B. Nathaniel Richter, of Richter, Lord, Levy, Toll & Cavanaugh, Philadelphia, Pa., for plaintiff.

George E. Beechwood, of Beechwood & Lovitt, Philadelphia, Pa., for defendant.

LUONGO, District Judge.

Before the Court are defendant's post trial motions for judgment on the whole record, for judgment n. o. v. and for a new trial. These motions stem from a civil action instituted by the plaintiff, Michael Matonti, to recover damages for personal injuries which he alleges were negligently caused by defendant, Research-Cottrell, Inc. Jurisdiction is based on diversity, plaintiff being a citizen of Pennsylvania and defendant a New Jersey corporation.

This case was tried to the Court and a jury, and resulted in a verdict for the plaintiff in the amount of Two Hundred Ten Thousand ($210,000) Dollars. Although the trial judge heard argument on defendant's post trial motions, his untimely death intervened before he had ruled on them.

On October 11, 1961, oral argument was heard by Chief Judge Clary and the writer of this opinion, and by order dated October 13, 1961, the case was re-

assigned to the writer for disposition of defendant's motions.

The facts of the accident and the injuries which resulted are not substantially disputed. However, the circumstances preceding the accident and particularly the legal inferences to be drawn therefrom, are sharply contested. The accident occurred on October 14, 1957, at the Schuylkill Generating Station of the Philadelphia Electric Company located at 28th and Christian Streets, Philadelphia, Pennsylvania. At the time, the Philadelphia Electric Company was engaging in major alterations of its Schuylkill Station. In connection therewith, it had entered into various contracts. For one, it had contracted with United Engineers and Constructors, Inc. (hereinafter "United") on February 14, 1955 to perform, under the Philadelphia Electric Company's direction, the following:

1. Demolition and relocation of existing facilities with alterations to present structures;

2. Installation of a condensing turbo-generator together with intake and discharge facilities; and

3. Installation of a boiler.

United undertook to act as Philadelphia Electric Company's construction department and, pursuant to the contract, to execute the construction and installation work with its own forces. United also agreed, however, that it would sublet work when it was found to be to Philadelphia Electric Company's advantage to do so.

On August 9, 1955, Philadelphia Electric Company had also entered into an agreement with Research-Cottrell, Inc. (hereinafter "Research") pursuant to which Research was to design, manufacture, deliver, unload and erect at the Schuylkill Station one electric precipitator shell.

Plaintiff was a construction worker, serving as a boiler maker or steam fitter. He had been hired through a Union Hiring Hall to work for Research, and for five or six weeks prior to the accident had been working for Research at the Schuylkill Station at 28th and Christian Streets. The Hiring Hall procedure was utilized since these men were not in the steady employ of any one concern. They were hired by the job which might last only a few days or for as long as several months.

In connection with its work of installing the precipitator, Research had a stiff-leg derrick on the roof of one of the buildings at the construction site. The building was then some twelve stories high and apparently this was the only derrick on the roof at the time the accident occurred. The derrick consisted of an eighteen foot mast and a seventy-five foot boom. The mast was attached to the roof by a steel plate. Vertical movement was accomplished by electrical power, but lateral movement required the mast, which was on a swivel, to be pulled manually by blocks or by a pulley.

Plaintiff was a signal man on the crew which operated the derrick. His job was to relay messages from the foreman, Eddie Verbit, to the operator of the derrick. The operator, because his vision was obscured by the building and equipment, could not observe the lifting process, and it was necessary for someone to indicate to him how to maneuver the load.

Research's head man on the site was Cook, who was the erector. The foreman of plaintiff's crew was Eddie Verbit. George Doren was the superintendent in charge for United. McGeady, the job engineer, was second in command for United, and Mulligan was the general boiler maker foreman for United.

It was Research's job to erect and install precipitators. There was nothing in its contract with Philadelphia Electric which required it to install fans. Part of United's job was the installation of certain fans. This required the raising of fan housings from the ground to the roof where they could be maneuvered into bays and installed by United.

Arrangements for the use of Research's derrick and men were made approximately one week before the date of

the accident between Cook, for Research, and Doren, for United, with McGeady of United present. A written purchase order was thereafter issued by United.

On October 14, 1957, plaintiff reported to work before 8:00 o'clock in the morning. He spent the morning doing work for Research. After lunch plaintiff and three other men under Verbit were told to use the derrick to raise a fan housing for United. In connection therewith they were to work with Mulligan, United's foreman.

The fan housing was in a field. It was brought over to the building to be lifted by the derrick. Mulligan hooked up the load and the fan housing was raised. When the load was raised to the required height it was necessary to pull the boom of the derrick laterally until the load was above the proper bay.

The derrick had given the men trouble before. On at least one other occasion, October 7, 1957, when Research's men were also doing some lifting work for United, the boom stuck. On that occasion it was pulled free and the job was completed without incident. Verbit testified that Cook (who died between the time of the accident and the trial) had instructed Verbit, prior to the lift in question, that if the boom were to stick again, he was to do the same thing he had done on the prior occasion. In the course of pulling the load laterally, the boom did stick again. Verbit spoke to Mulligan about what steps to take and Mulligan told him to see Cook. Verbit went to Cook who again instructed him to do as he had done before. Fearing that the boom was shaking too much to permit more pulling on it, Verbit contemplated instead the use of chain falls (a chain and gear device). He instructed his crew to leave everything as it was while a chain fall was secured, but while the crew was walking away, the boom collapsed.

At the time of the collapse, Verbit was standing beside the plaintiff on a beam on the tenth or eleventh story of the building. The boom and load were directly above the plaintiff. When Verbit saw the boom collapse he shouted to warn the plaintiff but before the plaintiff could avoid the boom, it struck him on the head, knocking him down. As he attempted to rise, the boom "twisted like a pretzel" and hit the plaintiff again, knocking him off the beam. He fell some twenty-five feet onto a concrete floor. From there he was removed immediately to the hospital.

As a result of the accident plaintiff suffered serious injuries, so serious that defendant has not attacked the amount of the jury's substantial verdict in plaintiff's favor.

The trial was a rather lengthy one and presented to the trial judge several difficult and complicated issues. Because in our view the jury was not given sufficiently detailed instructions to provide proper guidance to it in the determination of the complicated issues, we conclude that the interests of justice require the grant of a new trial.

The resolution of two broad issues control the disposition of the motions before us:

(a) adequacy of the instructions on the vexing problem of "borrowed servant"; and

(b) sufficiency of evidence to sustain the jury's finding of negligence on the part of defendant, Research, on the theory presented to it.

■ As to the "borrowed servant" or "loaned servant" issue, since all of the operative facts in the case occurred in Pennsylvania, it is controlled by Pennsylvania law. Funk v. Hawthorne, 138 F.2d 686 (3 Cir.1943).

There have been numerous "borrowed servant" cases in the Pennsylvania appellate courts. The legal principles to be applied in such cases are relatively simple and the statements thereof rather clear. Nevertheless, we agree with the Pennsylvania Superior Court when, in referring to "borrowed servant" cases, it said in Mitchell v. East Nantmeal Township, 181 Pa.Super. 482, 485, 124 A.2d 150, 151 (1956):

"The difficulty is not with the law, for it is well settled; the problem in cases of this class, is the application of settled principles to the peculiar facts of each particular case. * * * "

The difficulty has been evidenced by the forty-six borrowed servant cases heard by the Pennsylvania Supreme Court as well as the twenty in the Superior Court from 1900 to 1959. Bartl v. Crawford Door Sales Co., 394 Pa. 512, 515, 147 A.2d 399 (1959).

▉▉▉ The pivotal issue in the instant case is whether plaintiff at the time he was injured was the servant of Research, his general employer, and thereby relegated to his rights under the Pennsylvania Workmen's Compensation Act or the servant of United, and thereby entitled to pursue a civil action. Relevant to the determination of this issue are certain basic definitions.

" 'A master is one who stands to another in such a relation that he not only controls the results of the work of that other, but also may direct the manner in which such work shall be done.' 'A servant is one who is employed to render personal services to his employer otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter.'

'The relation of master and servant exists where the employer has the right to select the employé, the power to remove and discharge him, and the right to direct both, what work shall be done, and the way and manner in which it shall be done'.

" 'It is essential to the relation of employer and employee * * * that the employer shall have the power and authority to direct and control the acts of the alleged employee.

\*      \*      \*      \*      \*      \*

" 'Where a contract is let for work to be done by another in which the contractee reserves no control over the means of its accomplishment but merely as to the result, the employment is an independent one establishing the relation of contractee and contractor and not that of master and servant. * * * '" Joseph v. United Workers Association, 343 Pa. 636, 638, 23 A.2d 470, 472 (1942).

The issue before us may be stated another way: Did Research loan its equipment and employees to United, thereby establishing the relation of master-servant between United and the loaned employees, or did Research, as an independent contractor, undertake to perform a specific job for United preserving its master-servant relationship with the employees selected by it to perform the task?

Borrowed servant cases most frequently arise when a servant has injured a third person and the question to be decided is who shall be held responsible for the servant's act—his general or his special employer. As early as 1918 the Pennsylvania Supreme Court formulated the standard to be used in determining whether the general or special master was liable for the negligent acts of a servant. This standard was framed in terms of "control".

" ' *      *      * The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master, or becomes subject to that of the party to whom he is lent or hired.' " Puhlman v. Excelsior Express and Standard Cab Company, 259 Pa. 393, 397, 103 A. 218, 219, L.R.A.1918E, 118 (1918). To the same effect is Tarr v. Hecla Coal & Coke Co., 265 Pa. 519, 109 A. 224 (1920).

However, the subject of "control" has been complicated by the occasional lack of distinction between "actual control" and "right of control". Many cases have spoken of both "control" and "right of control" without being aware of a possible inconsistency which might be presented in certain factual situations.

Thus, in Eckert v. Merchants' Shipbuilding Corporation, 280 Pa. 340, 124 A. 477 (1924) while the court first placed considerable emphasis on which party exercised "dominion over and direction of the workman", it later spoke in terms of one having "power to control".

Most of the "borrowed servant" cases arise in situations involving liability on the theory of respondeat superior, however, there have been several cases involving factual situations similar to the one now before us.

In Venezia v. Philadelphia Electric Company, 317 Pa. 557, 177 A. 25 (1935) the issue was whether or not plaintiff at the time of the accident was an employee of defendant and thereby precluded from maintaining a civil action because of the exclusive remedies contained in the Workmen's Compensation Act. The court first determined that the terms "employer" and "employee" as used in the Workmen's Compensation Act were synonymous with "master" and "servant". It then proceeded to frame the test to be applied to the facts before it (317 Pa. at page 559, 177 A. at page 26):

> "The vital test in determining whether the workmen furnished by Tinaglia [general employer] were servants of defendant [special employer] is whether they were subject to its control or right of control not only with regard to the work to be done but also with regard to their manner of performing it."

The facts of the case revealed an agreement between the general and special employers whereby the latter was to furnish to defendant labor for excavating ditches; the contract as it was found by the court was not for the digging of ditches but for the furnishing of labor for digging ditches. Plaintiff was unable to prove that the general employer was an independent contractor and his own evidence, together with the written contract, showed that when the laborers were furnished they became subject to defendant's control. Defendant's foreman directed the results of their labors in contrast to the general employer's "boss" who merely saw to it that the men were on hand and kept time records.

In Walters v. Kaufmann Department Stores, Inc., 334 Pa. 233, 5 A.2d 559 (1939), on the other hand, where the same "vital test" was applied, the substantial factual differences required a finding of independent contractor relationship, and therefore defendant, owner of the department store in which plaintiff was injured, could not avail itself of the claimed exclusive remedy of the Workmen's Compensation Act. In Walters, plaintiff was hired by Carrollton Steel Co. to demonstrate its product in various department stores. The general employer instructed plaintiff as to the work she was to do and the manner in which she was to do it. No one else had authority to change those instructions; no one other than Carrollton Steel Co. gave her instructions while she worked in defendant store. She was not required to report to anyone in particular in the store, and no one in the store had authority over her. From these facts it was concluded that Carrollton Steel Co. did not relinquish its right to direct plaintiff in her work.

Although a "control" test was advanced in Hoffman v. Montgomery County, 146 Pa.Super. 399, 22 A.2d 762 (1941), several years later, in Dunmire v. Fitzgerald, 349 Pa. 511, 516, 37 A.2d 596, 599 (1944), one of the many rented car cases, the emphasis shifted to "right of control":

> "The test is always whether, in the particular service for which the employe was borrowed, he continued liable to the direction and control of his general employer or became subject to that of the party to whom he was lent or hired, not merely with regard to the result of the work but as to the way in which it should be performed. The criterion is not whether the borrowing employer *in fact* exercised control, but whether he had the *right* to exercise it."

See also Siidekum, Admr. v. Animal Rescue League of Pittsburgh, 353 Pa. 408, 45 A.2d 59 (1946); DiGregorio, Admr. v.

Berg, 359 Pa. 376, 59 A.2d 80 (1948). In McConnell v. Williams, 361 Pa. 355, 359, 65 A.2d 243 the court reverted to the old phrase, "control" or "right of control", but more recently in Mature v. Angelo, 373 Pa. 593, 97 A.2d 59 (1953) Chief Justice Stern re-examined the principles applicable in "borrowed servant" cases and enunciated what is clearly the law of Pennsylvania today (373 Pa. at pages 595 and 596, 97 A.2d at page 60):

> "The crucial test in determining whether a servant furnished by one person to another becomes the employe of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done *but also to the manner of performing it.* * * *
>
> "A servant is the employe of the person who has the *right* of controlling the manner of his performance of the work, irrespective of whether he actually *exercises* that control or not."

The "right of control" test was reaffirmed in O'Connell v. Roefaro, 391 Pa. 52, 137 A.2d 325 (1958).

The parties are in agreement that the proper test for determining who was plaintiff's employer was "who had the right to control him." And the trial judge so charged the jury. But "right of control" is the statement of a conclusion. The problem really consists of identifying the legally relevant factors which permit the conclusion to be drawn and of delineating those legally relevant factors as guidelines for the jury's consideration to enable it to arrive at an enlightened conclusion.

Apparently the most important factor in resolving the matter of "right of control" is the agreement entered into between the general employer and the alleged special employer. The contracting parties obviously may expressly agree which of them is to have the right of control over the employee in question. In one usual form of agreement, one contracting party merely agrees to make available his employees to the other for the performance of such duties as the other designates. In this form of agreement the other becomes, for the time being, the employer of the employees so furnished. In another usual form of agreement, one agrees to perform a certain designated task for the other, in effect, agreeing to produce a result. In this latter form of agreement, the one is regarded as an independent contractor, retaining throughout the master-servant relation with his employees. Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909); Hoffman v. Montgomery County, 146 Pa. Super. 399, 22 A.2d 762 (1941).

Where the relationship between the parties depends upon the meaning of a written contract, the determination of the relationship is for the court. Eckert v. Merchants Shipbuilding Corporation, 280 Pa. 340, 124 A. 477 (1942). Where there is no written agreement clearly defining the relationship, the issue is for the jury under proper instructions. Those instructions are simple where conflicting versions of the agreement are presented to the jury, each version with a clearly defined relationship, it is simply a matter of determining which version is the true one, for the resolution of that question determines which party had the "right of control".

Where, however, the terms of the agreement are not clear, or where, even though the terms of the agreement are clear, the relationship created thereby is not clear cut, what criterion may the jury use to resolve the issue of who had the right of control? The courts have approved numerous factors as legally relevant for consideration by the jury in determining that issue.

For example, in Brooks v. Buckley & Banks, 291 Pa. 1, 6, 139 A. 379 (1928), the following factors were emphasized: the right to select the employees, power to remove and discharge, the right to direct both what work was to be done and the manner in which it was to be done, and which party paid the employee.

In Mature v. Angelo, 373 Pa. 593, 597, 97 A.2d 59 (1953) the court enumerated.

various circumstances which indicate that the servant remains in the employ of the original master, to wit: the fact that the original master has the right to select the employee to be loaned, that he can discharge him at any time and send another in his place; that the lent servant has a special skill which the performance of the work requires; where the hiring is at a daily or hourly rate; and, finally, where the employment is for no definite period.

The jury may consider what was said and done during the performance of the work as some evidence of what the parties intended. Rau v. Wilkes-Barre and Eastern R. R. Co., 311 Pa. 510, 167 A. 230 (1933). Another factor that is sometimes resorted to is which of the parties "was bound to perform the particular piece of work in which the employee was engaged at the given time". Eckert v. Merchants Shipbuilding Corporation, 280 Pa. 340, 350, 124 A. 477, 481 (1924).

The above-mentioned circumstances are merely aids which "are to be applied only in those cases where the evidence does not clearly establish who is the employer. * * * The true criterion is the existence of power to control the employee at the time of the commission of the negligent act". McGrath v. Edward G. Budd Manufacturing Company, 348 Pa. 619, 623, 36 A.2d 303, 305 (1944); Eckert v. Merchants Shipbuilding Corporation, 280 Pa. 340, 124 A. 477 (1924).

On the issue of "right of control" the jury was instructed in the following terms (N.T. 519-520):

"The situation before us may be analyzed in this way: If a company —in this case United Engineers— wants a job to be done, and it doesn't have the employees and the equipment to do it, it may enter into either one of two kinds of arrangements with another company—in this case the other company being Research-Cottrell.

"In the first type of agreement the other company furnishes the men and equipment and places them under the exclusive control of the first company for the performance of the job. These men thereby become for the time being employees of the company which is borrowing them. That is the so-called borrowed employee situation.

"In the second situation the second company—in this case Research-Cottrell—itself performs the work with its men and equipment, retaining control over them. In this second situation, the second company is known as an independent contractor.

"It will be up to you to decide whether Research-Cottrell merely loaned its men and derrick to the United Engineers, in which case Mr. Matonti became United Engineers' employee, or whether Research-Cottrell contracted to do the lifting operation with its men and equipment, retaining control over them, in which case Mr. Matonti remained in the employ of Research-Cottrell, and then there would be no jurisdiction or ground for bringing this case.

"The important factor in determining which situation existed here is who had the right to control and direct the crew of the derrick in the performance of this job. Was it Mr. Mulligan of United Engineers or Mr. Cook of Research-Cottrell?

"In considering who had the right of control, you should distinguish between authoritative control and mere suggestions as to details or the cooperation needed to get the job done. The test is not who in fact exercises the control, but who has the right to exercise control. The right to control concerns not only the work to be done, but also the manner of doing the work.

"You are instructed that the question of who paid the plaintiff's wages for his work on the lifting operation is not the important factor in determining who his employer was. The important factor is who had the right of control over his activities

during the lifting operation of this fan housing. * * * "

Regarding the agreement between the parties, the following instructions were given (N.T. 521):

"If you find from the evidence that United Engineers entered into an agreement with Research-Cottrell under which United Engineers borrowed Research-Cottrell's men and equipment and assumed the right of control over them for the lifting operation, then the plaintiff became the employee of United Engineers.

"On the other hand, if you find from the evidence that the agreement was that Research-Cottrell was to perform the lifting operation using its employees and equipment and retaining control over them, then Research-Cottrell was in the position of an independent contractor, and Mr. Matonti remained an employee of Research-Cottrell, and your verdict would be for the defendant. * * * "

Both quoted portions of the charge on the crucial issue of "right of control" suffer from the same deficiency. They are statements of legal principles without the necessary supporting detail as to the factors to be considered by the jury and the legal effect of those factors, to enable the jury to arrive at a reasoned and intelligent conclusion.

There is no magic in the phrase "right of control". As Justice Cardozo so aptly stated:

" 'The law that defines or seeks to define the distinction between general and special employers is beset with distinctions so delicate that chaos is the consequence. No lawyer can say with assurance in any given situation when one employment ends and the other begins. * * * ' " Smith, Scope of the Business: The Borrowed Servant Problem, 38 Mich.L.Rev. 1222, 1228 (1940).

Failure to provide the jury with the necessary assistance in our opinion converted an always difficult task into an impossible one.

■ From the cases earlier discussed in this opinion, it is apparent that the single most important factor in determining who has the "right of control" is the agreement between the general employer and the alleged special employer. On this important element the court charged, in effect, that if United had borrowed these men, plaintiff was its employee, and on the other hand, if Research was an independent contractor, plaintiff remained its employee.

The jury was entitled to instructions as to which relationship was intended by the parties by their agreement. Indeed the agreement may have been oral, or it may have been partly oral and partly written or written. None of these possibilities was pointed out to the jury, and which was applicable depended upon findings to be made by the jury. As one example only, a purchase order and change order, both dated after the happening of the accident, were introduced in evidence by the defendant. Some question was raised as to the legitimacy of the change order, the intimation being that it was part of a scheme concocted to defeat plaintiff's claim. But no instruction was given to the jury that it was to determine whether the change order was genuine and intended to set forth the agreement of the parties, or whether it was a fabrication. If the change order was legitimate, the agreement appears to us to be clear and unambiguous, and one which the court was under a duty to interpret and instruct the jury on the relationship of the parties created thereby.

On the other hand, if the jury rejected the writings, there should have been pointed out to it the testimony bearing on an oral agreement. McGeady testified that he was present when the agreement was made. He testified as to the portions of the work to be done by United and that to be done by Research.

Certain facts testified to by McGeady, if true, were dispositive of the issue. The jury should have been instructed,

therefore, that if it found those facts to be true, then it must find that an independent contractor relationship existed. On the other hand if it did not accept those facts, either because they disbelieved McGeady or accepted the plaintiff's testimony, then it should have been instructed that it was to be guided by other considerations which we will now discuss, in making their decision.

Failing a disposition of the issue of "right of control" under a written or an oral agreement between United and Research, the jury then had the duty to resolve the "right of control" from all the circumstances. As previously pointed out, the courts have developed aids to determine which party had that right where it is not obvious from the agreement. Our examination of the cases where "right of control" had to be inferred from the circumstances reveals that the jurors were instructed at length as to which factors they should consider as supporting, on the one hand, the inference that the general employer was the master and which, on the other, supported the inference that the special employer was the master. Those factors include: right to hire and discharge, right to select the employees to be used on the job, who pays the employee, whether the employee has special skill required for the work, the fact that the hiring is at a daily or hourly rate or is employment for no definite period. These relevant and important guide posts were not clearly pointed out to the jury.

Much time and controversy was devoted at the time of trial to the question of how much control Mulligan, United's foreman, exercised over the hoisting of the fan housing. In our view, it served to emphasize that element out of all proportion, creating, we fear, the impression in the minds of the jury, that it was the all important question in the case.

Actual control may be relevant in a borowed servant case in two respects. One of the parties may exercise such control over the employee as to negate "right of control" in any other party.

Mechem, Outlines of Agency, 319 (1952); McGrath v. Edward G. Budd Manufacturing Company, supra. Even where the "right of control" is reserved by the general employer, if the employee in fact violates his duty to his general employer and follows the instructions of his special employer, he is acting without the scope of his original employment and not subject to the general employer's right of control. In such a case the exercise of control substitutes the special employer as master in place of the general employer.

However, the Pennsylvania courts have consistently held that the mere fact that a special employer points out the work to be done and the place where it is to be done, does not negate the original master-servant relationship. Mature v. Angelo, supra.

" 'As a practical proposition, every contract for work to be done reserves to the employer a certain degree of control—at least to enable him to see that the contract is performed according to the specifications. The employer may exercise a limited control over the work without rendering the employee a mere servant, for the relation of master and servant is not inferable from the reservation of powers which do not deprive the contractor of his right to do the work according to his own initiative so long as he does it in accordance with the contract.' " Healy v. Carey, Baxter & Kennedy, Inc., 144 Pa.Super. 500, 506, 19 A. 2d 852, 855 (1941).

"The line of distinction as to control and direction in 'cost-plus,' 'time and material,' or 'time, material and equipment' contracts, is that, in such contracts, the quality of the relation between the contractor who hires and the employee hired is not changed by the authority to direct and control reserved by the owner. The contractor hires, discharges, and pays the men, determines or controls their hours of work, the foreman they work under, and retains ulti-

mate control of the workman's manner of doing each particular step in the work." Brooks v. Buckley & Banks, 291 Pa. 1, 11, 139 A. 379, 382 (1927).

The testimony adduced by the plaintiff in the case before us fell far short of the "exercise of control" that the cases require to negate the "right of control" in another. The facts, considered in the light most favorable to plaintiff, that Mulligan told the crew when to lift and when to stop, in which bay the fan housings were to be put, etc. do not reveal such control as to be inconsistent with the "right of control" in defendant.

The exercise of control, where not of sufficient degree to negate the "right of control" in another, may nevertheless serve as evidence on "right of control". In other words, the exercise of control is a factor relevant to the existence of right of control, and the jury should have been so instructed. Unfortunately the instructions on exercise of control were, we believe inconsistent and confusing. At one point the jury was charged:

"The exact amount of supervision exercised by Mr. Mulligan is in dispute, and it is an important factor in determining whether or not the plaintiff was an employee of Research-Cottrell at the time of the accident or whether he became for the time being an employee of Mr. Mulligan's firm, United Engineers." (N.T. 518.)

And at another point:

"The test is not who in fact exercises the control, but who has the right to exercise control." (N.T. 520.)

We believe a consistent, detailed instruction on the effect of "actual control" was necessary to the proper determination of this case. And since "actual control" was only one factor to be considered in determining the important issue of "right of control", undue emphasis was placed on it by the failure to mention any of the other many factors which also should have been considered.

We believe that, under the circumstances of this case, some instruction on the effect of the Workmen's Compensation agreement ought to have been given. Defendant was permitted to introduce in evidence, although not in the presence of the jury, a Workmen's Compensation agreement entered into between plaintiff and defendant and based on this accident. At the close of the case counsel for plaintiff withdrew his objection to the admissibility of the agreement, and the court changed its ruling and not only permitted counsel to argue the effect of the agreement to the jury but also allowed it to go out with the jury. However, no instructions were given as to the effect the jury could give to the agreement.

Defendant urges that the agreement is res judicata between the parties on the issue of agency. Since the agreement between plaintiff and Research was purportedly an agreement between employee and employer for an injury suffered in the course of employment, defendant argues that plaintiff may not now assert a contrary position, i. e. that he was the servant of United Engineers and not Research-Cottrell.

Pennsylvania courts have applied the general rule that where a party has obtained the adjudication of an issue before a competent tribunal he cannot relitigate the issue. This is particularly so where the position of the moving party is sustained in the first proceeding and he later attempts to repudiate that position. Kuhn v. Pennsylvania Railroad Co., 270 Pa. 474, 113 A. 672 (1921); Buehler v. Philadelphia & Reading Ry. Co., 280 Pa. 92, 124 A. 325 (1924). However, the facts of this case do not fit within the general rule. Here there was no prior adjudication of the issues, merely a voluntary agreement. The doctrine of res judicata is thus inapplicable.

The agreement would be proper evidence, at least, as an extra judicial admission against interest. Morrett v. Fire Association of Philadelphia, 265 Pa. 9, 108 A. 171 (1919). As such it would

be competent evidence on the issue of master-servant relationship. We would, however, go further and hold it to be prima facie evidence of the master-servant relationship.

The following provisions from the Pennsylvania Workmen's Compensation Act are relevant.

"§ 731. * * * On or after the seventh day after any accident shall have occurred, the employer and employe or his dependents may agree upon the compensation payable to the employe or his dependents under this act; * * *

"All agreements made in accordance with the provisions of this section shall be in writing, and signed by all parties in interest.

"All agreements for compensation and all supplemental agreements for the modification, suspension, reinstatement, or termination thereof, and all receipts executed by any injured employe of whatever age, or by any dependent to whom compensation is payable under section three hundred and seven, and who has attained the age of sixteen years, shall be valid and binding unless modified or set aside as hereinafter provided." 77 P.S. § 731.

"§ 771. * * * The board, or a referee designated by the board, may, at any time, review and modify or set aside an original or supplemental agreement, upon petition filed by either party with the board or in the course of the proceedings under any petition pending before such board or referee, if it be proved that such agreement was in any material respect incorrect." 77 P.S. § 771.

■ We wish to emphasize the phrase "all agreements—shall be binding unless modified or set aside as hereinafter provided". Compensation agreements have been held to be prima facie evidence of a compensable accident, imposing the burden of proof upon the one who seeks to change the status evidenced by the agreement. Rehm v. Union Collieries Company, 152 Pa.Super. 461, 33 A.2d 637 (1943); Williams v. Baptist Church, 123 Pa.Super. 136, 188 A. 168 (1936). This approach would seem to warrant treatment of a Compensation Agreement and the facts alleged therein as prima facie evidence of those facts until disproved by the moving party.

■ Does section 771 provide the exclusive remedy for challenging a Compensation Agreement? We think not. Section 771 seems to authorize an exclusive procedure where the issue is one of decrease in disability, error in original amount of compensation, etc. Morrow v. United Iron & Metal Co., 72 Pittsb.Leg. J. 80 (1924). However, where there was no basis for entering into the agreement initially and the ultimate determination of the parties' rights must depend on an adjudication by a court of law, the same considerations do not apply. It seems impractical to compel two proceedings to decide one issue. Where the attack against the agreement is jurisdictional, as it is in the case before us, the matter may be raised collaterally. However, the fact that plaintiff is permitted in a federal court to question the jurisdiction of the Workmen's Compensation Board to approve the agreement in no way minimizes his burden to prove that jurisdiction was lacking.

In so far as negligence is concerned, the case was submitted to the jury for its consideration on the theory that Cook negligently instructed Verbit what to do if the boom stuck, i. e. to "pull on the boom" (N.T. 523–524) and this pulling caused the boom to collapse.

■ We have searched the record carefully for evidence to support a finding that Cook's instruction was improper, unusual or created an unreasonable risk of harm to the crew operating the derrick, or that acting in compliance with that instruction was the cause of the boom's collapse. All that we have been able to find is plaintiff's counsel's argument to the jury demonstrating the danger of a seventy-five foot boom with an eighteen foot mast. We found neither expert nor lay testimony in the record to throw any light on whether it was dan-

gerous or negligent to pull on such a boom attached to such a mast. What the record does support is an *inference* that defendant may have knowingly furnished a defective piece of equipment. In his brief in opposition to defendant's post trial motions, plaintiff argues that defendant did knowingly furnish a defective piece of equipment. That issue should be resolved by a jury under proper instructions and not left in the realm of speculation.

For the foregoing reasons, defendant's motion for new trial will be granted. Its motions for judgment n. o. v. and judgment on the whole record will be denied.